**Affirmed and Opinion filed June 15, 2012.**



In The

# Fourteenth Court of Appeals

### NO. 14-12-00119-CV

### IN THE INTEREST OF D.R.A. AND A.F., CHILDREN

**On Appeal from the 312th District Court
Harris County, Texas
Trial Court Cause No. 2010-04091J**

## O P I N I O N

Appellant D'Angelo T. appeals from the trial court's order terminating his parental rights to his daughter, D.R.A. In two issues, he challenges the legal and factual sufficiency underlying the trial court's termination findings. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

On May 13, 2010, the Texas Department of Family and Protective Services (DFPS) received a referral alleging neglectful supervision and physical neglect of two-year-old D.R.A. and her one-year-old sister A.F.[1] by their mother, Meddie; their maternal grandmother, Meddie T.; and their maternal aunt, Jessica. D.R.A. resided with her sister,

---

[1] D'Angelo is not A.F.'s father.

Meddie, Meddie T., and Jessica in an apartment. When the child protective service worker and apartment staff arrived at the home, they found the children unaccompanied by an adult. Taking into consideration the unknown whereabouts of the children's fathers, DFPS took the children into custody on the ground that they were at risk of continued abuse and neglect.

On June 3, 2010, DFPS filed an Original Petition for Protection of a Child, for Conservatorship, and for Termination of the Parent-Child Relationship and Application for Writ of Attachment as to D.R.A. and A.F. and Request for Temporary Orders. After an ex parte hearing, the trial court entered an emergency protective order making DFPS temporary sole managing conservator of the children. D.R.A. was placed into a home with Meddie's aunt, Ruthie.[2]

On June 17, 2010, the trial court ordered D'Angelo to comply with the terms of DFPS's family service plan. On July 28, 2010, D'Angelo signed the plan, which required, among other things, that he complete parenting classes, maintain appropriate housing for D.R.A., undergo a psychological evaluation, complete a drug and alcohol assessment, submit to random drug testing, obtain and maintain stable employment for at least six consecutive months, and refrain from criminal activity.[3]

On or around September 23, 2010, D'Angelo participated in a home burglary as the getaway driver. He was arrested and subsequently convicted and sentenced to two years in prison for the burglary offense. He was released from prison in August 2011 after having been incarcerated for eleven months.

On November 10, 2010, D'Angelo was formally adjudicated as D.R.A.'s biological father. A bench trial was held on December 15, 2011. In the final termination order signed on January 12, 2012, the trial court terminated D'Angelo's parental rights based on Family Code section 161.001(1), subsection (O), finding D'Angelo failed to

---

[2] In addition to her great-niece D.R.A., Ruthie also had custody of several nieces and nephews. At the time of trial, she had custody of six minor children, including D.R.A.

[3] The plan states that D'Angelo did not participate in its creation.

comply with the court-ordered family service plan, and section 161.001(2), finding that termination was in D.R.A.'s best interest.

## LEGAL AND FACTUAL SUFFICIENCY CHALLENGE

In two issues, D'Angelo challenges the legal and factual sufficiency of the evidence supporting the trial court's termination findings. He specifically argues that DFPS did not prove D.R.A. was removed from the home for abuse or neglect and that the evidence was insufficient to overcome the presumption that maintaining the parent-child relationship is in D.R.A.'s best interest.

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Due to the severity and permanency of the termination of parental rights, the burden of proof at trial is heightened to the clear and convincing standard. *See* Tex. Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *accord In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *In re S.N.*, 287 S.W.3d 183, 187 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

When determining legal sufficiency, we review "all the evidence in the light most favorable to the court's finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d at 266. To give appropriate deference to the factfinder's conclusions, we must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* However, this does not mean that we must disregard all evidence that does not support the finding. *Id.* Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

3

When reviewing a factual sufficiency challenge under the clear and convincing burden, the analysis is somewhat different in that we must consider all of the evidence equally, both disputed and undisputed. *See id.* We must consider whether the evidence is sufficient to produce in the mind of the factfinder a firm belief or conviction as to the truth of the allegation sought to be established. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

In a proceeding to terminate the parent-child relationship brought under section 161.001 of the Texas Family Code, the petitioner must establish, by clear and convincing evidence, one or more acts or omissions enumerated under subsection (1) of 161.001 and that termination is in the best interest of the child under subsection (2). Tex. Fam. Code § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005); *In re S.N.*, 287 S.W.3d at 187.

## I. Failure to Complete Family Service Plan

In his first issue, D'Angelo challenges the trial court's termination of his parental rights because he contends the evidence is legally and factually insufficient to support termination under Texas Family Code section 161.001(1)(O). To terminate parental rights based on 161.001(1)(O), a trial court must find by clear and convincing evidence that the parent

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

Here, D'Angelo does not dispute that D.R.A. was in the custody of DFPS or that

4

he did not comply with all of the requirements of the family service plan. Instead, D'Angelo argues that DFPS cannot meet its burden of proof because D.R.A. was not removed as the result of abuse or neglect on his part. D.R.A. was removed from Meddie's home. However, subsection (O) does not require that the parent who failed to comply with a court order be the same parent whose abuse or neglect of the child warranted the child's removal. *In re S.N.*, 287 S.W.3d at 188. Thus, D'Angelo's argument that D.R.A. was not removed due to his abuse or neglect and, therefore, subsection (O) does not apply, is without merit.

We still must determine, however, whether the evidence is sufficient to support the trial court's finding that D.R.A. was removed from her mother's home because of abuse or neglect. *See id*. at 190. The family service plan for D'Angelo, signed by a DFPS case worker on July 28, 2010, was admitted into evidence without objection. The plan enumerated the following facts.

On May 13, 2010, DFPS received a referral alleging neglectful supervision and physical neglect of A.F. and D.R.A. by their mother, grandmother, and aunt. The referral alleged two-year-old D.R.A. and one-year-old A.F. were "always found unsupervised everyday alone, two to three hours during the day and have been reported seen at night outside alone as well." The family's apartment where D.R.A. and A.F. resided was off the main entrance to the apartment complex and across from the pool. The children would wander around the complex without diapers and with dirty faces. This issue was ongoing from January 2010 through May 2010 when the referral was made. In March 2010, a pest control company entered the apartment and found feces all over the floor and open diapers lying on the floor and couch and open lunch meat on the counter. The apartment was infested with rodents, and the pest control company labeled it a "dangerous health sanitation situation and a healthy [sic] safety hazard." The children were found by the DFPS case worker and apartment staff to be unaccompanied by an adult. We conclude that the evidence is legally and factually sufficient to support the trial court's finding that D.R.A. was removed under Chapter 262 for abuse or neglect. We

5

overrule appellant's first issue.

## II. Best Interest of the Child

In his second issue, D'Angelo challenges the legal and factual sufficiency of the trial court's finding that termination was in D.R.A.'s best interest pursuant to section 161.001(2).

There is a strong presumption that the best interest of the child is served by keeping the child with its natural parent, and the burden is on DFPS to rebut that presumption. *In re S.N.*, 287 S.W.3d at 191. To rebut this presumption, there must be clear and convincing evidence of the natural parents' present unfitness. *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). The same evidence of acts or omissions used to establish grounds for termination under section 161.001(1) may be probative in determining the best interest of the child. *In re S.N.*, 287 S.W.3d at 191. In reviewing the sufficiency of the evidence to support the second prong, a court examines several factors, including (1) the desires of the child, (2) the present and future physical and emotional needs of the child, (3) the present and future emotional and physical danger to the child, (4) the parental abilities of the persons seeking custody, (5) the programs available to assist those persons seeking custody in promoting the best interest of the child, (6) the plans for the child by the individuals or agency seeking custody, (7) the stability of the home or proposed placement, (8) acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate, and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976); *In re S.N.*, 287 S.W.3d at 191. This list is not exhaustive, and evidence is not required on all nine factors to support a finding terminating a parent's rights. *Holley*, 544 S.W.2d at 372; *In re S.N.*, 287 S.W.3d at 191. With these considerations in mind, we review the evidence below.

**Desires of the child**. D.R.A. was four-years-old at the time of trial, and no evidence was presented regarding her desires with respect to D'Angelo. Thus, this factor does not factor into our analysis.

6

**Present and future physical and emotional needs of the child**. Regarding this factor, we note that the need for permanence is a paramount consideration for the child's present and future physical and emotional needs. *See Dupree v. Tex. Dep't of Protective and Regulatory Servs.*, 907 S.W.2d 81, 87 (Tex. App.—Dallas 1995, no writ). The goal of establishing a stable, permanent home for a child is a compelling government interest. *In re M.A.N.M.*, 75 SW 3d 73, 77 (Tex. App.—San Antonio 2002, no pet.).

Ruthie testified that D.R.A. is a child who needs stability and "if you tell her something, that is what she looks forward to." Ruthie further testified that D.R.A.'s placement was stable and Ruthie wanted D.R.A. to grow up in a home where she "don't have to feel like people come in and out of her life every other month."

D'Angelo had been out of jail on parole for four months at the time of trial and lived with his mother. He had been employed since his release from prison earning $8.50 per hour. He also was caring for his other child who was then six- or seven-months-old. He testified that D.R.A. had lived with him and his mother for over six months in 2010, she knew him "as daddy," he taught her to count from one to ten, and he taught her the alphabet. D'Angelo provided no financial assistance to D.R.A. after she was in DFPS custody, although he brought her toys on one occasion and clothes on another occasion.[4] He said Ruthie never asked him for money but would tell him what D.R.A. needed.[5] Thus, D'Angelo presented some evidence of his ability to meet D.R.A.'s physical and emotional needs.

**Present and future emotional and physical danger to the child**. To "endanger" means to expose the child to loss, injury, or danger. *K.H. v. Tex. Dep't of Family and Protective Servs.*, No. 03-11-00560-CV, 2012 WL 1959370, at *1 (Tex. App.—Austin June 1, 2012, no pet. h.) (mem. op.) (citing *In re M.C.*, 917 S.W.2d 268, 269 (Tex.

---

[4] The parentage order of November 10, 2010 did not establish a child support obligation; however, it found "each parent responsible to support the child in accordance with their means pending final orders."

[5] D'Angelo testified that he would have a problem paying Ruthie money, but not providing D.R.A. what she needs. He testified that he would do what the court ordered.

1996)). The endangering conduct does not have to occur in the presence of the child. *Id.* DFPS argues D'Angelo's criminal history,[6] including the burglary he committed in September 2010 after D.R.A. was in DFPS custody, and the fact that D'Angelo tested positive on one of his drug tests after D.R.A. was in DFPS custody pose emotional and physical dangers to D.R.A. There is no evidence that D'Angelo's past choices, while immature and illegal, exposed D.R.A. to loss, injury, or danger or that D'Angelo will make choices in the future exposing D.R.A. to such risks.[7] This factor does not support the trial court's finding.

**Parental abilities**. This factor takes into account the parental abilities of the person attempting to avoid termination. *See in re U.P.*, 105 S.W.3d at 231. D'Angelo testified that D.R.A. lived with him and his mother for six months in 2010 and he taught D.R.A. the alphabet and to count to ten. He visited D.R.A. a few times after she was in DFPS custody. He estimated that he visited D.R.A. two times before his burglary arrest. He was then incarcerated for eleven months, but visited four times after his release. He also attempted another visit, but was turned away because he arrived after D.R.A.'s bedtime. The last time D'Angelo visited D.R.A. was six weeks before trial. At the time of trial, D'Angelo was living in a two-bedroom apartment with his mother, working, and attempting to enroll in Houston Community College.

The family service plan identified several tasks for D'Angelo to complete. One goal of the plan was for D'Angelo to demonstrate his acceptance of the responsibility of being a parent. D'Angelo did not comply with several aspects of the plan.[8] He could not

---

[6] In January 2007, approximately ten months before D.R.A. was born, D'Angelo was convicted and sentenced to three days' jail time for stealing a cell phone. When D.R.A. was seven-months-old, D'Angelo committed another theft, stealing one pair of socks, four shirts and six pairs of shorts, and was sentenced to ten days in jail. In January and again in November 2009, he was sentenced to 10 days' and then 2 days' jail time for misdemeanor possession of marijuana.

[7] D'Angelo's incarceration and separation from D.R.A. was a loss to her, but not in the sense of physical injury or danger.

[8] Steven, the father of A.F., another of Meddie's children, did not complete his family service plan. His parental rights were not terminated, and A.F. now lives with his parents.

"maintain stable employment for six consecutive months" due to his incarceration.[9] He testified that he underwent the psychological examination, but DFPS did not have a record of that. He attended some parenting classes after his release from prison but had not completed two of the required classes by the time of trial.[10] As set forth above, he also failed one drug test[11] and engaged in criminal activity. Although D'Angelo made some effort by visiting D.R.A. and complying with certain aspects of the family plan, to determine whether D'Angelo would be an able parent, the factfinder was entitled to consider that his visits were sporadic and interrupted by a significant amount of jail time resulting from a crime committed after D.R.A. was in DFPS custody and that D'Angelo failed to comply with significant aspects of the family plan. *See In re S.N.*, 287 S.W.3d at 192.

**Available programs**. This factor takes into account assistance programs available to the person seeking to avoid termination in promoting the best interest of the child. *See In re U.P.*, 105 S.W.3d at 231; *In re M.A.N.M.*, 75 S.W.3d at 79. The plan states that D.R.A. was provided Medicaid through DFPS "while in foster care," but no evidence was presented as to whether D.R.A. would be eligible for Medicaid if D'Angelo were awarded custody. The only evidence presented regarding any programs available to D'Angelo to help promote D.R.A.'s best interest was D'Angelo's testimony that he was attending parenting classes in accordance with the plan and Alcoholics Anonymous (AA) four times a week as a parole requirement. D'Angelo did not have an AA sponsor and could not tell the trial judge what step he was on in the twelve-step program. DFPS could not confirm whether D'Angelo had attended the AA meetings. This factor does not weigh in D'Angelo's favor.

---

[9] At the time of trial, D'Angelo had worked for his current employer for three or four months and worked there about 18 months before his incarceration.

[10] D'Angelo testified that he tried to enroll in parenting classes as soon as he was released from prison, but could not start until approximately two months before trial. The series of classes he was required to take last six to eight weeks.

[11] Meddie and Steven, A.F.'s father, failed drug tests on the same day as D'Angelo. Steven's parental rights were not terminated.

**Plans for the Child by Parent Seeking to Avoid Termination or Agency Seeking Custody and Stability of the Home or Proposed Placement.**  These two factors compare the agency's plans and proposed placement of the child with the plans and home of the parent seeking to avoid termination.  *See in re U.P.*, 105 S.W.3d at 231. D'Angelo did not outline any specific plans for D.R.A.'s future other than an intention to be her conservator.[12]  *See id.*  At the time of trial, he lived with his mother in a two-bedroom apartment.  No evidence was presented regarding how long he intended to live there.  Ruthie wishes to adopt D.R.A., which is DFPS's recommendation.  Ruthie cares for six children, including her sister's children and D.R.A.  She testified that she wants to provide D.R.A. a stable home so that D.R.A. does not "feel like people come in and out of her life every other month."  Ruthie works full time, and no evidence was presented regarding whether D.R.A. would have a stable male influence in her life if adopted by Ruthie.  Taking these factors into consideration in conjunction with the entire record, a factfinder could reasonably conclude that D.R.A.'s best interest would be better served through DFPS's plan for D.R.A. to be adopted by Ruthie rather than through D'Angelo's plan to be D.R.A.'s possessory conservator.  *See In re C.H.*, 89 S.W.3d at 28 (noting evidence about placement plans and adoption are relevant to best interest but must be considered in context of entire record).

**Acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate and any excuses for acts or omissions**.  We finally consider D'Angelo's acts or omissions and any excuses for his acts or omissions.  As set forth above, D'Angelo was incarcerated for eleven months while D.R.A. was in DFPS's custody.[13]  He only visited D.R.A. a handful of times before and after he was

---

[12] D'Angelo testified he was asking "[f]or my rights not to be terminated and for me to finish my classes and somehow get custody of my child."

[13] Incarceration of two years or more for conviction of an offense is a sufficient ground for termination under subsection 161.001(1)(Q) coupled with a finding that termination is in the best interest of the child.  *See* Tex. Fam. Code § 161.001(1)(Q), (2).  We note that D'Angelo's incarceration was only eleven months, so the trial court could not terminate under subsection 161.001(1)(Q).  However, the trial court was entitled to consider D'Angelo's criminal history, including incarceration, to support the finding that termination was in D.R.A.'s best interest as an act indicating the existing parent-child relationship is

incarcerated. Before D.R.A. was removed from her mother's home, D'Angelo was convicted twice for theft[14] and twice for possession of marijuana. He also failed one drug test that he was required to take under the family plan. He provided no financial support to D.R.A. after she was removed from her mother's home. He did not attend all of the parenting classes required by the family plan.

D'Angelo did not present an excuse for his illegal conduct, although he stated he made a "a choice of error" in participating in the burglary. He admitted that it was not in D.R.A.'s best interest for him to commit crimes. He did not "anticipate getting in any other type of legal trouble."[15] He was attending AA classes as part of his parole requirement. He also provided for some of D.R.A.'s needs by taking her toys on one occasion and clothes on another. Although he would have a problem paying child support to Ruthie, he indicated he was willing to provide for D.R.A.'s needs and would pay child support if ordered by the court. D'Angelo had attempted to enroll in parenting classes as soon as he was released from jail and completed several before trial

---

not appropriate. *See, e.g., In re C.H.*, 89 S.W.3d at 28 (considering father's extensive criminal history as part of acts or omissions analysis and noting evidence under section 161.001(1) may also be considered in best interest analysis); *In re S.N.*, 287 S.W.3d at 193 (considering appellant's incarceration for a suspended driver's license at the time his children were removed and later 18-day incarceration for outstanding traffic violations as acts or omissions relevant to best interest analysis).

[14] The first conviction happened approximately ten months before D.R.A. was born.

[15] This colloquy was prompted by D'Angelo's counsel:

| [Question:] | Since [the burglary], have you realized that it is not in the best interest of your child to commit any crimes? |
|---|---|
| [Answer:] | Yes, ma'am. |
| [Question:] | Since that crime, have you learned any life lessons since then? |
| [Answer:] | Yes, ma'am. |
| [Question:] | Is it your statement to the court that you don't anticipate getting in any other type of legal trouble? |
| [Answer:] | Yes, ma'am. |
| [Question:] | Is it your statement to the court that you are ready to take responsibility for not only [D.R.A.] but the other child that you have? |
| [Answer:] | Yes, ma'am. |

11

commenced. He also testified that he completed the psychological examination as required by the plan, although DFPS did not have a record of that and disputes that he completed this requirement. In determining D'Angelo's parental rights should be terminated, the factfinder was entitled to consider D'Angelo's criminal history, his failed drug test, his sporadic visits and support of D.R.A., his other failures to comply with the family plan, and his credibility in stating that he would not commit further crimes. *See in re S.N.*, 287 S.W.3d at 193.

Viewing the evidence in the light most favorable to the judgment for our legal sufficiency analysis and all of the evidence equally for our factual sufficiency analysis, we conclude that a reasonable factfinder could have formed a firm belief or conviction that D'Angelo was an unfit parent at the time of trial and that the best interest of D.R.A would be served by termination of D'Angelo's parental rights. We therefore find the evidence legally and factually sufficient to support the trial court's finding. We overrule D'Angelo's second issue.

We affirm the judgment of the trial court.


/s/    Martha Hill Jamison
       Justice


Panel consists of Justices Boyce, Christopher, and Jamison.