**Affirmed and Memorandum Opinion filed October 19, 2017.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-17-00394-CV

---

## IN THE INTEREST OF A.F. AND A.F., CHILDREN

---

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2016-01756J**

---

## M E M O R A N D U M   O P I N I O N

Appellant S.J.F. ("Mother") appeals the trial court's final decree terminating her parental rights and appointing the Department of Family and Protective Services as sole managing conservator of her children A.F. ("Andrea") and A.F. ("Alberto").[1] The trial court terminated Mother's parental rights on predicate grounds of endangerment. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D) and (E) (West Supp. 2016). The trial court further found that termination of Mother's rights was in the

---

[1] "Andrea" and "Alberto" are pseudonyms. Pursuant to Texas Rule of Appellate Procedure 9.8, we use fictitious names to identify the minors involved in this case.

children's best interest.  In three issues, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's findings on each predicate ground, as well as the best-interest finding.  Because we conclude the evidence is legally and factually sufficient to support the trial court's findings, we affirm.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Pretrial Proceedings

#### 1.    The Department Referral

When Andrea was four years old and Alberto was three years old, the Department received a report alleging sexual abuse of both children by their father S. R. F. ("Father").  Mother took Andrea to Texas Children's Hospital and Mother reported that Andrea told her that her "nunu" hurt.  Andrea refers to her vagina as her "nunu."  The hospital report noted that Mother reported that Father touched Andrea "at least twice."  Andrea reported that Father touched her vagina and her bottom.[2]  The day of the referral, Mother reported that Mother woke up to find herself half dressed with no memory of the night before, raising her concern that Father may have forced himself on her while she was sleeping.  Mother confronted Father about Andrea's statement.  Father became angry and cursed at Andrea.  Father kicked Mother and Andrea out of the home but kept Alberto with him.  The hospital recommended that Mother have a sexual-assault exam as well.

Law enforcement officers had been to the home for domestic disturbances five times within the year before the referral.  Mother has stated that she plans to leave Father and has been to several shelters, but repeatedly returns to Father.  Mother and Father both have a long history of using crystal methamphetamine in Mississippi

---

[2] The record does not reflect further allegations of sexual abuse against Alberto. If the Department investigated the allegation, the resolution of its investigation is not in our record.

and Texas. Mother sought treatment in the past, and both parents stopped abusing drugs for a while, but started using drugs again approximately four to five months before the referral. Both Mother and Father have a history of suicide attempts.

Mother admitted to using drugs while the children were in the home and stated that Father forcibly injected her with methamphetamine. The record reveals three prior referrals on the parents regarding drugs in Texas and two prior referrals regarding drugs and domestic violence in Mississippi. When Alberto was eight months old, he tested positive for methamphetamine. Mother allowed Father to have contact with the children even after the Department asked that he have no contact with them. Mother has a history, in both Texas and Mississippi, of leaving and then returning to Father. The children reported that Mother took them from a shelter to see Father and, during that visit, Father threatened Mother with a gun.

### 2. The Investigation

On the day of the referral a Department investigator made face-to-face contact with Mother at Texas Children's Hospital. Mother stated she wanted to stop taking drugs and she wanted to leave Father due to domestic violence. Earlier in the week Mother had been at the Star of Hope shelter when Father contacted her because he needed her signature to cash a tax-refund check. Against her better judgment, Mother went with Father who, according to Mother, forcibly injected her with methamphetamine. Mother displayed the puncture mark, which, according to the investigator, "did in fact look inflamed enough to have been a forced puncture." Mother reported that Father had sexually assaulted Mother previously, possibly using drugs to do so. Mother also reported that Father "leverages the safety of the children to keep her in line." Mother has a plan to stop using drugs and, if allowed to keep the children, she plans to go to an inpatient recovery program. Mother took the children away from Father when Andrea made the sexual-assault outcry. Mother

3

stated she is willing to do whatever is necessary to keep her children.

The investigator also had face-to-face contact with Andrea at Texas Children's Hospital. The investigator reported that Andrea did not know the difference between the truth and a lie. She also could not understand any type of hypothetical. Andrea reported that she is four years old, and sees Father argue with Mother and hit Mother. She reported that Father spanks her. Andrea is afraid of Father, but not Mother. Andrea reported that she knows the part of her body that no one is supposed to touch and indicated it by pointing to her groin area. Andrea stated that Father touched her there and it did not occur during bathing or while helping her change clothes.

The investigator met with Mother's recovery coach from an inpatient treatment center in Beaumont. The treatment center has reserved a spot for Mother and will allow the children to live with her there. The next day another investigator received a call from the recovery coach, who reported that Mother was not able to get into the inpatient program in Beaumont, but went to "The Bridge" shelter. The investigator contacted Mother who reported that her children were born in Mississippi and she had moved to Texas just recently. Mother denied using drugs during pregnancy. Mother reported that Father's sixteen-year-old daughter, who had been living with them, moved out because she "was tired of dealing with the issues" with Father. Mother reported that Mother "is bipolar" and suffers from post-traumatic stress disorder. The investigator noted that at the time of the investigation Mother was "taking Invega once a month, Chantix twice a day, Trazadone for sleep and Wellbutrin." Mother receives monthly disability payments and food stamps. Mother reported suicidal thoughts fifteen years earlier, but has not had thoughts of suicide recently. Mother started going to the Mental Health and Mental Retardation Authority ("MHMRA") when she moved to Texas, but her MHMRA caseworker

stopped visiting Mother because the caseworker is afraid of Father.

Mother started using methamphetamine when she was thirteen years old. She stopped using drugs for five years and used drugs "off and on" after that. Mother said the last time she had used methamphetamine was Monday of the week the Department took her children into care. Mother said Father injected her with methamphetamine and she woke up with her pants down. Mother reported that her method of use is to smoke methamphetamine, not inject it. Mother is on five years' probation for a gun charge in Mississippi. She had the gun to use against Father. Mother has tried to leave Father "a thousand times," but keeps going back to him "because she feels like she owes him something."

Mother has called the police on Father three times. Mother has been to several shelters since moving to Texas, but goes back to Father when she runs out of money. Mother reports that when she uses methamphetamine the children are asleep or in their room playing. When Mother first met Father he was cooking and smoking methamphetamine. Mother denied that Father is currently cooking methamphetamine, but says that he uses a drug named "superman-blue pill with a letter S," and is possibly using heroin. When Father is angry he will verbally and physically abuse Mother. Mother believes Father spanks the children too hard. Alberto will punch Mother or grab her by the throat. Father has told Alberto to spit in Mother's face. Alberto also acts out by hitting his sister.

The investigator explained to Mother that, according to the safety plan for the children, they were not allowed to see Father. The investigator further explained that Mother would be asked to complete a drug test the following day and the investigator would schedule a forensic interview for the children.

The investigator followed up with Mother's recovery coach. The coach originally became involved with Mother at an outpatient after-care program, and acts

as a support system for Mother. Mother was not accepted into the after-care program because it requires that a patient remain drug-free for ten days before entering the program. Because Father forcibly injected Mother with methamphetamine, Mother was not free of drugs for ten days and so the program rejected her.

The investigator met with both children. Alberto appeared healthy with no visible marks or bruises. On the day of the interview he was not feeling well and sat on Mother's lap. Alberto did not know the difference between the truth and a lie. The child did not disclose any sexual abuse. Alberto admitted that Father hits him. Alberto said Father also hit Mother. Andrea was timid, but could tell her age by holding up four fingers. Andrea mentioned that Father hurts Mother. Andrea also appeared healthy with no visible marks or bruises. Andrea reported that Father touched her bottom and grabbed her and put her on top of the bed. She reported being in bed with both parents and Mother's pants were down. Andrea reported that Father "does dope." Andrea reported that her parents fought and that "daddy injected her mommy." She said that Father likes guns. She also reported that Father whips her with a belt. Andrea reported she did not feel safe with Father "because he is bad."

### 3. Department History

Three years earlier, when the family lived in Mississippi, the children were taken to a hospital and Father reported that Mother was using "crystal meth." Father reported that he was a recovering addict and that Mother takes the children with her when she "scores drugs." Alberto tested positive for methamphetamine when he was eight months old.

A year later, while the family still lived in Mississippi, the Department of Human Services in Mississippi received reports that (1) the parents were beating one of the children and the child was heard screaming, (2) the parents verbally and

physically fight with each other, (3) Mother took the children with her during drug transactions, and (4) both parents used crack and heroin in front of the children.[3]

After the family moved to Texas, approximately one year after the last report from Mississippi, the Department received a referral alleging physical abuse of both children by Mother. Both parents submitted to drug tests of their hair and urine. Mother tested positive for methamphetamine in both her hair and urine. Father's hair follicle test was positive. Mother entered and completed outpatient treatment; the children went to the treatment facility with Mother. The case was referred to Family Based Safety Services and was closed after the parents remained drug free for approximately five months.

Within two months the Department received another referral alleging neglectful supervision and physical abuse of both children. Both parents had started using drugs again, and had engaged in domestic violence. Drug tests on the parents were negative and the case was closed.

### 4. Criminal History

Mother has a criminal history in Texas of being a fugitive from out of state. Mother has a cocaine charge from the United States Army and a criminal history out of Mississippi on a gun charge for which she is on probation. Mother's probation from Mississippi was transferred to Harris County, Texas.

In Texas, Father has three convictions for burglary, a conviction for public intoxication, malicious mischief, possession of a controlled substance, transporting aliens, and indecent exposure. In Mississippi, Father also has a criminal history, the details of which are unknown.

---

[3] The affidavit does not reflect who made the reports in Mississippi.

### 5.     Removal of the Children

The Department sought an emergency order removing the children from their parents due to the parents' drug use and domestic violence.  The investigator filed the case because both parents used drugs in the children's immediate presence, and the children witnessed repeated domestic violence.  Mother missed an appointment with a Baytown police officer who was trying to admit Mother into a treatment program.  When Mother missed the appointment, the investigator received a call from the Bridge shelter reporting that Mother left the shelter for the weekend to visit Father.  Mother expressed a desire to move back to the trailer where Father was living.

On the day the Department filed its original petition for termination and removal affidavit, the trial court signed an order finding that the children were removed pursuant to Texas Family Code section 262.104,[4] that there is a continuing danger to the physical health or safety of the children if returned to the parents, or the children were victims of sexual abuse.  The court further found that the nature of the emergency and the continuing danger to the welfare of the children made efforts to allow the children to remain with, or return to, the parents impossible or unreasonable. The court appointed the Department as the sole managing conservator of the children.

### B.     Trial Testimony

### 1.     The Parents

Mother testified that at the time of trial Andrea was five years old and Alberto was four.  Mother was in the process of a divorce from Father.  Six months after

---

[4] Texas Family Code section 262.104 provides that the Department may take possession of a child in an emergency without a court order. Tex. Fam. Code Ann. § 262.104. (West Supp. 2016).

Andrea's hospital exam, Mother recanted the story of Andrea reporting sexual abuse because Mother had begun working the steps of a twelve-step program. As part of the program Mother felt the need to admit that she had made a false report. Mother testified that the referral was made to the Department when she took Andrea to the hospital after Andrea made an outcry of sexual abuse against Father. Mother claims that Andrea mimicked a statement made earlier by Mother. At the time Mother took Andrea to the hospital she said she was unsure whether the abuse had occurred.

On the day Mother took Andrea to the hospital Mother reported that Father sexually assaulted Mother in her sleep, and inappropriately touched Andrea. Andrea was in bed with both parents when the alleged abuse occurred. Andrea underwent a sexual assault exam at the hospital. Andrea had a bruise on her bottom and another bruise on her forehead. Mother said she did not remember how Andrea got the bruises. Several months later, Mother told a prosecutor that she no longer believed that Andrea had been sexually abused. Mother was asked whether Andrea told Mother that Father touched her. Mother responded, "She repeated me." In reference to the allegation that Father abused Andrea, Mother further testified as follows:

> Q. (BY [the Department's attorney) When did you recant the sexual abuse allegation?
>
> A. When I was working my steps with my sponsor, and I was told to be honest about everything, and I prayed and prayed and prayed and it got to the point in my recovery where it was time to be honest and own up to my mistakes.
>
> Q. Okay. You realized you lied about it?
>
> A. I didn't realize it. I knew.
>
> Q. You knew that you lied about the sexual abuse allegation?
>
> A. Yes.

Mother admitted telling medical personnel that Father forcibly injected her with methamphetamine, but at trial Mother said that she had lied. Mother also

admitted reporting that Father sexually assaulted her in her sleep. Mother's testimony was unclear as to whether the report of sexual assault was false. Mother also equivocated about her report that Father would instruct Alberto to spit in her face. While Mother and Andrea were at the hospital Alberto was with Father. Mother reported that she was concerned about Alberto's safety while in his Father's care.

Mother testified that she began using methamphetamine when she was thirteen years old, but had been sober for almost one year before trial. When asked about both children's positive hair follicle tests for methamphetamine Mother stated that the test results were most likely a result of the children being around the parents while the parents were smoking methamphetamine. Mother had periods of sobriety and claimed that she did not begin smoking methamphetamine again until Alberto was about 18 months old. Mother also admitted both verbal and physical abuse by Father and that the children were in the house when the domestic violence occurred. The children were also present when Mother smoked methamphetamine.

Mother testified that she tested positive for methamphetamine while living in Mississippi when the children were both under four years old. The Department of Human Services ("DHS") in Mississippi was called due to drugs and domestic violence. Mother denied that she moved to Texas to avoid the DHS charges in Mississippi.

On cross-examination by her attorney Mother testified that she had completed all the tasks in her family service plan. Mother is on step eight of her twelve-step recovery program. Mother has not tested positive for drugs in almost a year and has maintained regular visits with her children. Mother testified that her previous accusation that Father had forcibly injected her with methamphetamine was false.

Father testified that he started using methamphetamine in 2005, when he was

33 or 34 years old. Father confirmed Mother's testimony that he supplied her with methamphetamine, but he said they never used it together. Father stopped using methamphetamine for five years, but started using again in 2015. Father acknowledged Andrea's and Alberto's hair follicle test results were positive for, respectively, methamphetamine, and cocaine and methamphetamine. Father could not answer why the children tested positive. Father admitted hitting Mother, but denied the sexual abuse allegation made by Andrea.

Father tested positive for methamphetamine in February 2017, and positive for cocaine and methamphetamine in March 2017, one month before trial. Before those test results, Father had several negative drug tests.

Father also completed all the tasks on his family service plan. At the time of trial Father was attending Alcoholics Anonymous meetings, and had been doing so for nine years. Father admitted relapsing approximately four months before trial. Father asked that the children be placed with Mother.

Mother's recovery coach testified that she has helped Mother during the last year of her sobriety. The coach has counseled Mother and helped with her goals. The coach believes that Mother has the ability to remain sober and protect her children. The recovery coach has seen a significant change in Mother over the past year.

### 2. The Children

The caseworker testified that both children were in a foster home. The children had behavioral issues such as "not listening, having feces or pooping on themselves, smearing it, touching themselves, not being on a routine." The children's fighting with each other goes beyond normal sibling rivalry. The children curse at each other, pinch, and when poking each other "purposely go for the eyes."

11

The children's inappropriate behavior has led to issues in trying to place them.

At one point the children were placed with a relative, but were removed from that placement. The reason the children were removed related to their behavioral issues, but, after the children's removal, the Department learned that the relative had been violating the rules for placement. Specifically, the relative allowed the children to visit another relative whose home had been rejected for placement. The relative's home had been rejected because the relative had a history with the Department, had "past alcohol issues," and had a teenager living in the home who was undergoing outpatient treatment.

The caseworker testified that both parents completed their services on their family service plan. Father did not remain drug free, but otherwise completed services. Despite the completion of services the Department sought termination of parental rights due to protectiveness issues raised by domestic violence and drug use in the home. The caseworker testified that termination of parental rights is in the best interest of the children because even though the sexual-abuse allegation was dismissed, the children display behaviors associated with victims of sexual abuse. According to the caseworker, neither parent recognizes that the children's behaviors indicate that they may have been victims of sexual abuse. The parents' continued drug use also raises a concern for the children's protection. Both children are in therapy to address physical aggressiveness and behaviors indicative of sexual abuse.

Due to the children's exposure to domestic violence and drug abuse in the home they are at risk. Even after the parents completed their family service plans, the parents' relapsing, lying, and manipulation put the children at significant risk for permanent abuse if they were returned to the home.

The Child Advocates' representative testified that Child Advocates recommended termination of both parents' rights and adoption for the children. The

12

Child Advocate testified that the children's physically aggressive behaviors had increased, and that they had incidents of urinating and defecating in public, and in the home. Despite Mother's recent sobriety, the parents have a pattern of drug abuse and domestic violence that endangers the children. The Child Advocate testified that she believes Andrea was sexually abused despite Mother's recantation of the allegation. The Child Advocate believes the abuse occurred because Andrea has been consistent in her statements about what occurred. That Mother no longer believes the abuse occurred is a source of concern for the children's welfare. Mother has demonstrated a pattern of allowing Father to have contact with the children despite a stated resolve not to allow him access. On cross-examination the Child Advocate admitted that the children's escalating behavioral issues could be attributed to their movement from different foster homes.

The trial court terminated Mother's parental rights on the predicate grounds of endangerment. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D) & (E). Father's rights were terminated on the predicate grounds of endangerment and failure to follow the family service plan. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E) & (O). Mother appeals the trial court's findings on the predicate grounds and the finding that termination is in the best interest of the children. Father does not appeal the termination of his parental rights.

## II. ANALYSIS

### A. Standards of Review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to

13

recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

Due to the severity and permanency of terminating the parental relationship, Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

In reviewing legal sufficiency of the evidence in a parental termination case, we must consider all evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d at 336. We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *Id.*; *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th Dist.] 2014, no pet.). However, this does not mean that we must disregard all evidence that does not support the finding. *In re D.R.A.*, 374 S.W.3d at 531. Because of the heightened standard, we also must be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

In reviewing the factual sufficiency of the evidence under the clear-and-convincing burden, we consider and weigh all of the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire

14

record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* We give due deference to the fact finder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

In a proceeding to terminate the parent-child relationship brought under section 161.001 of the Texas Family Code, the petitioner must establish, by clear and convincing evidence, one or more acts or omissions enumerated under subsection (1) of section 161.001(b) and that termination is in the best interest of the child under subsection (2). Tex. Fam. Code § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

## B.    Predicate Grounds

In her first and second issues Mother argues the evidence is legally and factually insufficient to support the trial court's findings under subsections D and E of section 161.001(b)(1).

Both subsections D and E of section 161.001(1) use the term "endanger." "To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam). Subsection D requires a finding that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(D). Subsection E requires a finding that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(E).

Endangerment under subsection D may be established by evidence related to the child's environment. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "Environment" refers to the acceptability of living conditions, as well as a parent's conduct in the home. *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ). A child is endangered when the environment creates a potential for danger of which the parent is aware but consciously disregards. *See In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.); *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Inappropriate, abusive, or unlawful conduct by a parent or other persons who live in the child's home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection D. *In re M.R.J.M.*, 280 S.W.3d at 502.

Under subsection E, the evidence must show the endangerment was the result of the parent's conduct, including acts, omissions, or failure to act. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Termination under subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* A court may consider actions and inactions occurring both before and after a child's birth to establish a "course of conduct." *In re S.M.*, 389 S.W.3d 483, 491–92 (Tex. App.—El Paso 2012, no pet.). While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffers injury; rather, the specific danger to the child's well-being may be inferred from parents' misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re R.W.*, 129 S.W.3d 732, 738–39 (Tex. App.—Fort Worth 2004, pet. denied). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being.

*In re A.B.*, 412 S.W.3d 588, 599 (Tex. App.—Fort Worth 2013), *aff'd*, 437 S.W.3d 498 (Tex. 2014).

The relevant conduct includes not only the parents' conduct as evidenced by the parents' acts, but also the parents' omissions or failures to act. Endangerment can also include knowledge that a child's parent abused drugs. *In re M.J.M.L.*, 31 S.W.3d 347, 351–52 (Tex. App.—San Antonio 2000, pet. denied) (finding evidence legally sufficient for endangerment where father knew mother was a drug addict and that she abused drugs while pregnant, even though father attempted to get mother to stop taking drugs).

In evaluating endangerment under subsection D, we consider the child's environment before the Department obtained custody of the child. *See In re J.R.*, 171 S.W.3d 558, 569 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Under subsection E, however, courts may consider conduct both before and after the Department removed the child from the home. *See In re S.R.*, 452 S.W.3d at 361 (considering pattern of criminal behavior and imprisonment before and after removal).

Evidence of criminal conduct, convictions, and imprisonment and its effect on a parent's life and ability to parent may establish an endangering course of conduct. *In re S.M.*, 389 S.W.3d at 492. Mere imprisonment, standing alone, does not constitute engaging in conduct that endangers the physical or emotional well-being of the child. *Boyd*, 727 S.W.2d at 533. However, routinely subjecting children to the probability that they will be left alone because their parent is in jail endangers the children's physical and emotional well-being. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

Mother argues that since the removal of the children to the Department's care she complied with the family service plan and has not engaged in conduct that

endangers the children. The record reflects, however, that Mother endangered her children by continually engaging in illegal drug use before and after the children were born and after DHS involvement in Mississippi.

A parent's continuing substance abuse can qualify as a voluntary, deliberate, and conscious course of conduct endangering the children's well-being. *See J.O.A.*, 283 S.W.3d at 345; *In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *S.R.*, 452 S.W.3d at 361–62. By using illegal drugs, the parent exposes the children to the possibility that the parent may be impaired or imprisoned and, therefore, unable to take care of the children. *See Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617–18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

The trial court is not required to ignore a long history of dependency and abusive behavior merely because the behavior abates as trial approaches. *See In re J.F.C.*, 96 S.W.3d at 272 (holding parents' extensive history of substance abuse and violence was not rendered legally insufficient by improvements that appeared to render their home safe and loving five months before trial); *In re M.G.D.*, 108 S.W.3d 508, 513–14 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Mother's attacks on the endangerment findings are largely, if not solely, based on the proposition that completion of a family service plan effectively precludes an endangerment finding. But Mother directs us to no case so holding. To be sure, successfully completing a family service plan, particularly over an extended period of time, is entitled to significant weight. *See In re C.V.*, ___ S.W.3d ___; 2017 WL 3723507 at *4 (Tex. App.—Amarillo Aug. 25, 2017, no pet. h.). However, evidence of a recent turnaround should be determinative only if it is reasonable to conclude that rehabilitation, once begun, will surely continue. *In re M.G.D.*, 108 S.W.3d 508, 514 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

In *In re M.G.D.*, this court found that a parent's "recent turnaround" and compliance with a service plan are factors a fact finder should consider in a determination of best interest, but these factors are not determinative in a sufficiency review. *In re M.G.D.*, 108 S.W.3d at 514-15. *See also In re J.O.A.*, 283 S.W.3d at 346 (evaluating legal sufficiency of endangering conduct evidence; noting "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices"); *In re S.A.W.*, 131 S.W.3d 704, 709 (Tex. App.—Dallas 2004, no pet.) (termination held to be in best interest despite mother's lifestyle improvements and eventual compliance with service plan). *See also In re K.C.M.*, 4 S.W.3d 392, 399 (Tex. App.—Houston [1st Dist.] 1999, pet. denied), *overruled in part on other grounds, In re C.H.*, 89 S.W.3d 17 (Tex. 2002) (finding evidence supported contention that "jail turned [mother's] life around" and rendered evidence that termination was in best interest factually insufficient).

Although the record reflects that Mother completed her service plan, it also demonstrates that she continued to make decisions in her relationship with Father that endangered the children. In the Child Advocates report, the Child Advocate noted that Mother was cooperative with the Department in completing all service tasks, but the Child Advocate did not agree with family reunification. The Child Advocate based her decision on Mother's "inability to protect the children, positive drug screens for methamphetamines for [the children], domestic violence, and sexual abuse allegations." The Child Advocate noted that Mother has a history of returning to Father despite domestic violence and allegations of sexual abuse. After being instructed by the Department to avoid contact with Father, Mother left the shelter where she was living and took the children to see Father.[5]

---

[5] Although not admitted at trial, this report is in the clerk's record on appeal. The court

19

Compliance with a family service plan does not render termination impossible or trump all other termination factors. *See In re M.G.D.*, 108 S.W.3d at 514. "The elements of a safe, stable, and happy childhood cannot all be reduced to a checklist in a service plan." *Id.* The trial court could have held a firm conviction that, despite Mother's compliance with the family service plan, her endangering conduct was likely to continue. Given the parents' long history of illegal drug use and violence, the fact finder was justified in considering the risk of relapse to be unacceptably high when weighed against Mother's completion of the family service plan.

In addition, the evidence supports the trial court's finding that Mother endangered the children for almost the entirety of their lives by exposing them to domestic violence and failing to maintain separation from Father with whom she engaged in domestic violence. Mother also failed to protect her children by recanting her report that Father sexually abused Andrea, which the trial court reasonably could have believed unworthy of credence given Mother's immediate report to the hospital upon first hearing Andrea's outcry and Andrea's not deviating from her account of what happened. *See K.M. v. Tex. Dep't of Fam. & Prot. Servs.*, 388 S.W.3d 396, 403 (Tex. App.—El Paso 2012, no pet.) (holding sufficient evidence of endangerment that mother did not believe child's claims of sexual assault).

Reviewing all the evidence—including the evidence summarized above—in the light most favorable to the termination findings under subsections D and E, we conclude that a reasonable fact finder could have formed a firm belief or conviction as to the truth of the findings that Mother endangered both children through her own

could consider the report in making its findings on predicate grounds and best interest. *See In re K.F.*, 402 S.W.3d 497, 504 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (presuming a trial court takes judicial notice of its file without any request being made and without any announcement that it has done so).

conduct and by placing them in an endangering environment. *See In re J.O.A.*, 283 S.W.3d at 344. In light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of these termination findings is not so significant that a fact finder could not reasonably have formed a firm belief or conviction as to the truth of these termination findings. *See In re H.R.M.*, 209 S.W.3d at 108. As the finder of fact and sole judge of the credibility of the witnesses, the trial court was free to disregard any or all of Mother's self-serving testimony. *See In re S.A.H.*, 420 S.W.3d 911, 927 (Tex. App.—Houston [14th Dist.] 2014, no pet.). We hold the evidence is legally and factually sufficient to support the predicate termination findings under subsections D and E, and overrule Mother's first two issues.

## C. Best Interest of the Children

In her third issue Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination is in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2).

Among the relevant factors to evaluate the child's best interest are (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parents' acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); *see also* Tex. Fam. Code Ann. § 263.307(b) (West 2014) (listing factors to

21

consider in evaluating parents' willingness and ability to provide the child with a safe environment).

Courts apply a strong presumption that the best interest of the children is served by keeping the children with their natural parents, and the burden is on the Department to rebut that presumption. *In re U.P.*, 105 S.W.3d at 230. Prompt and permanent placement of the children in a safe environment also is presumed to be in the children's best interest. Tex. Fam. Code Ann. § 263.307(a).

Mother contends that the presumption of keeping the children with their natural parent is not rebutted because she has bonded with her children and her plans for the children are certain and the Department's plans for the children are tenuous. Mother further argues that she completed her service plan and has learned how to protect her children since they came into the Department's care.

Multiple factors support the trial court's determination that termination of Mother's rights was in the children's best interest.

1.      *Desires of the children*

At the time of trial Andrea was five years old and Alberto was four years old. The record does not reflect either child's desires. When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

In this case, the evidence shows that the children continue to suffer consequences from their abusive upbringing. To address these consequences, the children are receiving therapy while in foster care. The trial court could have determined that the time spent with the natural parents before coming into the

Department's care, while not minimal, was damaging, and that removing the children from the endangering environment is in their best interest.

2.    *Present and future physical and emotional needs of the children*

Regarding this factor, we note that the need for permanence is a paramount consideration for the children's present and future physical and emotional needs. *See In re D.R.A.*, 374 S.W.3d at 533. The goal of establishing a stable, permanent home for a child is a compelling government interest. *Id*.

The evidence is undisputed that while in Mother's care, the children witnessed repeated instances of drug use and domestic violence. Also while in Mother's care, Andrea made an outcry of sexual abuse. Mother's position as to whether she believed Andrea's outcry notably changed over time. Immediately after the outcry, Mother took Andrea to the hospital where Andrea was subjected to an extensive sexual assault examination. Mother's initial actions show that she treated Andrea's outcry as genuine. Months later, however, Mother told the prosecutor that she had lied about Andrea's outcry and that Mother did not believe Father sexually abused Andrea.  If Mother's later position is true, then Mother intentionally and unnecessarily subjected Andrea to an invasive sexual assault examination, which reflects, at a minimum, a lack of empathy as to the examination's emotional impact on Andrea. If, on the other hand, Mother truly believed Andrea's outcry initially, then Mother's decision to change her testimony is similarly troubling. In all events, Mother's overall testimony with respect to Andrea's outcry casts substantial doubt on Mother's credibility. In addition, both children tested positive for illegal drugs. The record does not reflect whether the positive tests were the result of ingestion or exposure to a high quantity. Neither parent could explain why these two young children tested positive for methamphetamine. A fact finder may infer from a parent's past inability to meet the children's physical and emotional needs an

23

inability or unwillingness to meet the children's needs in the future. *See In re J.D.*, 436 S.W.3d at 118.

The trial court's best-interest finding is supported by evidence that Mother could not provide for the present and future physical and emotional needs of the children.

3.    *Acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate, and any excuse for the parent's acts or omissions*

Mother's history of drug abuse and its attendant unstable lifestyle, plus her continued participation in domestic violence, and stated disbelief of her daughter's sexual-abuse outcry, not only support the trial court's endangerment finding but also support the best-interest determination. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) (explaining that parent's history of drug use is relevant to trial court's best-interest finding); *see also In re S.R.*, 452 S.W.3d 351, 366–67 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (the fact finder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent).

Although a reasonable fact finder could fairly credit Mother's progress and decide it justified the risk of preserving the parent relationship, we cannot say the trial court acted unreasonably in finding the children's best interest lay elsewhere. *See In re M.G.D.*, 108 S.W.3d at 514. It is not our role to reweigh the evidence on appeal, and we may not substitute our judgment of the children's best interest for the considered judgment of the fact finder. *See id.* at 531 (Frost, J., concurring).

Therefore, this factor weighs in favor of termination.

4.    *Parental abilities of those seeking custody, stability of the home or proposed placement, and plans for the children by the individuals or agency seeking custody*

24

These factors compare the Department's plans and proposed placement of the children with the plans and home of the parents seeking to avoid termination. *See In re D.R.A.*, 374 S.W.3d at 535. The caseworker testified that the children were in a safe, stable home with foster parents. The children continue to act out in foster care and an adoptive home has not yet been found.

Evidence about placement plans and adoption are, of course, relevant to best interest. *In re C.H.*, 89 S.W.3d at 28. However, the lack of evidence about definitive plans for permanent placement and adoption cannot be the dispositive factor; otherwise, determinations regarding best interest regularly would be subject to reversal on the sole ground that an adoptive family has yet to be located. *Id*. Instead, the inquiry is whether, on the entire record, a fact finder reasonably could form a firm conviction or belief that termination of the parent's rights would be in the children's best interest—even if the agency is unable to identify with precision the children's future home environment. *Id*.

Accordingly, the Department's lack of a definitive adoption plan for the children at the time of trial does not render the evidence insufficient to support the trial court's finding that termination of Mother's parental rights is in the children's best interest. The Department and the foster parents are working to assist the children in overcoming the behaviors developed during their formative early years in the endangering environment in the parents' home. Although there was no plan at the time of trial, the trial court could have determined that keeping the children with the foster parents with an eye toward adoption was in the children's best interest as opposed to placing the children with Mother.

Viewing the evidence in the light most favorable to the judgment for our legal-sufficiency analysis and all of the evidence equally for our factual-sufficiency analysis, we conclude that a reasonable fact finder could have formed a firm belief

25

or conviction that termination of Mother's rights was in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2).  We overrule Mother's third issue.

### III.  CONCLUSION

The evidence is legally and factually sufficient to support the predicate termination findings under subsections D and E.  And, based on the evidence presented, the trial court reasonably could have formed a firm belief or conviction that terminating Mother's parental rights was in the children's best interest so that the children could promptly achieve permanency through adoption.  *See In re T.G.R.-M.*, 404 S.W.3d 7, 17 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *In re M.G.D.*, 108 S.W.3d at 513–14.

We affirm the decree terminating Mother's parental rights and naming the Department managing conservator.


/s/     Kevin Jewell
                    Justice


Panel consists of Chief Justice Frost and Justices Boyce and Jewell.