**Affirmed and Memorandum Opinion filed October 11, 2018.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-18-00384-CV

_____

## IN THE INTEREST OF F.M., A CHILD

---

**On Appeal from the 314th District Court
Harris County, Texas
Trial Court Cause No. 2017-01774J**

---

## M E M O R A N D U M    O P I N I O N

Appellant B.V. ("Mother") appeals the trial court's final decree terminating her parental rights and appointing the Department of Family and Protective Services as sole managing conservator of her child F.M. ("Floyd").[1]  The trial court terminated Mother's parental rights on predicate grounds of endangerment and use of a controlled substance in a manner that endangered the health or safety of the child.  *See* Tex. Fam.

---

[1] Floyd is a pseudonym.  Pursuant to Texas Rule of Appellate Procedure 9.8, we use fictitious names to identify the minor and other individuals involved in this case.

Code Ann. § 161.001(b)(1)(D), (E), and (P) (West Supp. 2017). The trial court further found that termination of Mother's rights was in the child's best interest. In a single issue Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination was in the child's best interest.[2] Because we conclude the evidence is legally and factually sufficient to support the trial court's best interest findings, we affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Pretrial Proceedings

#### 1. Pretrial Removal Affidavit

On November 9, 2016, the Department received a referral alleging neglectful supervision and sexual abuse of Floyd by Mother. At the time, Floyd was five years old. It was alleged that Mother was using methamphetamine and that needles were left in the open and accessible to Floyd. The affidavit described Mother's symptoms of methamphetamine use, including sores on her face, legs, and hands. The affidavit further noted mental health diagnoses of bipolar disorder, borderline personality disorder, and drug and alcohol addiction. Floyd reported sexual abuse to Mother, but would not speak about the abuse with the Department representative. Floyd had sores on his genitals, which were reportedly present for approximately two to three weeks. Mother's attempts at treatment for addiction, both residential and outpatient, proved unsuccessful. Floyd appeared neat and clean, but occasionally missed school because Mother failed to ensure his attendance.

---

[2] The trial court also terminated the rights of the child's father on the grounds that he did not comply with a court-ordered service plan and that termination was in the child's best interest. Father has not appealed the termination of his parental rights.

## 2. The Investigation

Mother was generally not forthcoming during her initial caseworker interview, but the caseworker obtained the following information. Mother reported that Floyd's father lives in Mexico and is paralyzed from an accident. Mother used to work as a nurse, but has not been employed for the last five years. Mother reported being "afraid of someone, but she can't say their name because if she did, it would look like she is using drugs." Mother has been diagnosed with depression, Attention Deficit Hyperactivity Disorder, and anxiety. Mother takes several prescription medications to address her mental health diagnoses.

Mother did not allow the caseworker to interview Floyd, but the caseworker observed him. Floyd was playing with toys, was appropriately dressed, and had no marks or bruises on him.

The caseworker did not observe any methamphetamine or needles in the home. The home had sufficient food, working appliances, and running water. Mother's drug test results from the day of the caseworker's visit were positive for marijuana and amphetamine.

Three months later, the caseworker's supervisor spoke with Mother via telephone. Mother claimed that her positive drug test result for methamphetamine was a false positive. She also argued that she took ibuprofen, which resulted in a false positive for marijuana. Mother excused her positive result for amphetamine by blaming it on her prescription medication.

One month later, another caseworker spoke with personnel in the leasing office of the apartment complex where Mother lived. The leasing office personnel reported that Mother uses illegal drugs and alcohol, and associates with homeless and transient people. They reported receiving complaints about increased foot traffic to and from

Mother's apartment.

The caseworker spoke with Floyd, who said he always had food to eat and that his mother prepared his meals. Floyd reported that his mother smoked cigarettes and drank beer, but no one in his home used drugs. Floyd was not afraid of anyone in his home and felt safe at home. Floyd said he was never left at home alone, and denied anyone touching him inappropriately.

Insofar as school attendance was concerned, the caseworker spoke with school authorities at Floyd's school, who reported that as of March, Floyd had twenty-two absences and twelve tardies for the school year.

Mother reported that the sores on Floyd's penis were caused by poor hygiene due to Floyd not being circumcised, not abuse. The doctor gave Mother a cream to apply. Mother had been diagnosed with herpes, and asked whether she could have passed it to Floyd. The Children's Crisis Care Center (4 C's) report, which was admitted at trial, noted that, according to Mother, the Department had ruled out the reported the sexual abuse allegations. Mother had another child who died from Sudden Infant Death Syndrome (SIDS), and was afraid that the Department would take Floyd.

### 3.    Department History

In 2008, the Department received a referral regarding Mother alleging neglectful supervision of another child, which was ruled out because the child did not disclose any type of abuse or neglect.[3] In 2009, the Department received a referral of neglectful supervision and physical neglect, which was ruled, "unable to determine." The 2009 case was referred due to "child fatality," which pertained to Mother's child who died from SIDS. In 2011, apparently at Floyd's birth, the Department received a referral

---

[3] Floyd was born in 2011. The record mentions an eighteen-year-old daughter and a daughter who died as a result of SIDS, but the record is not specific as to whom the referrals before Floyd's birth refer.

because Mother tested positive for alcohol during pregnancy, but not at delivery. Mother was reported to be a chronic alcoholic with a history of domestic violence. The Department had temporary custody of Floyd, but Floyd stayed with Mother at an addiction treatment center.

In 2012, the Department received a referral of neglectful supervision, which was ruled, "unable to determine." The report notes that while Mother was in a residential substance abuse facility, she took Floyd to a store where she purchased alcohol. She returned inebriated to the treatment facility, where she tripped and injured her face. The facility staff stated that Mother appeared intoxicated, and that she refused to take a breathalyzer test.

In 2014, the Department received another report of neglectful supervision due to drug use. Mother took a drug test, which was negative for illegal drugs.

In 2016, the Department received a referral alleging sexual abuse of Floyd, which was investigated and ruled out because there was no evidence of neglectful supervision and no disclosure of sexual abuse.

### 4. Criminal History

When the petition for termination was filed, Mother had a pending charge of driving while intoxicated with a child under fifteen years old. The record does not reveal the charge's disposition.

### 5. Family Service Plan

Following removal, the trial court signed a temporary order appointing the Department as Floyd's temporary managing conservator and ordering Mother to comply with a family service plan. The order explained that Mother's failure to comply with the court's orders could result in restriction or termination of her parental rights.

The family service plan required Mother to:

- refrain from participating in any illegal activities;

- follow all recommendations of a drug assessment caseworker;

- make the necessary arrangements for transportation to ensure the timely completion of the tasks outlined in the service plan;

- complete a psycho-social evaluation and follow all recommendations;

- provide the caseworker with names of physicians and/or clinics that provided medical care for the child and sign a release of information from all service providers allowing the Department to obtain information related the healthcare of the child;

- enroll, attend, participate in, pay for, and successfully complete parenting classes;

- attend and participate in all court hearings, permanency conferences, scheduled visitations, and meetings requested by the Department or the courts;

- follow all recommendations and/or complete all services offered by the therapists, services providers, and the Department to help eliminate the risk of harm to the child;

- complete a psychiatric evaluation and follow all recommendations;

- obtain, pay for, and maintain appropriate housing for herself and the child;

- provide for the child through employment; and

- successfully complete individual therapy.

## 6.    Court-Appointed Advocate's Report

The court-appointed advocate filed a report, which noted that as of August 14, 2017, Mother was in an addiction treatment center. At that time Mother had completed a psycho-social and drug assessment. Before going into the treatment center, Mother tested positive for amphetamine, marijuana, methamphetamine, Oxazepam, benzoylecgnonine, and cocaine. After leaving the treatment center, Mother was not actively engaged in substance abuse group or individual counseling. Mother also tested

6

positive for benzoylecgonine and cocaine after leaving the treatment center. Mother participated in supervised family visits with Floyd every other week. The child advocate and Mother attended Floyd's kindergarten graduation.

The child advocate noted that Floyd seemed comfortable in his foster home. He had a pleasant room, two foster brothers, and two dogs, which he enjoyed. He was attending day camp during the summer and was enjoying field trips. During the school year he attended elementary school and did very well. The foster parent was attentive and meeting Floyd's needs.

**B.     Trial Testimony**

At the beginning of trial, the Department introduced into evidence the citations of service showing personal service on Mother and service by citation on Father, documentation of Floyd's birth and Father's parentage, the removal affidavit, the show cause order, the status hearing order and the family service plans, Mother's drug test results, the 4 C's family evaluation, records from the inpatient treatment program Mother attended, the Department's permanency plan and progress report, and the Child Advocate's report. All exhibits were admitted without objection.

The caseworker testified that the case began after Mother had been referred to Family Based Safety Services. Mother was ordered to submit to drug testing, but was not cooperative at first. When Mother did submit to testing she tested positive for methamphetamine. After a show cause hearing the Department was awarded temporary managing conservatorship. The caseworker testified that Mother had an eighteen-year-old daughter who lived with her father's family. Mother had another child in 2009 who died as a result of SIDS.

On May 18, 2017, the court held a status hearing, during which Mother was ordered to submit to a drug test. Mother tested positive for cocaine. The caseworker

testified that he could smell alcohol on Mother's breath in court at the status hearing.

Later, in August 2017, Mother entered a residential treatment program. When she was discharged from the program, it was recommended that she enter into "supportive residential treatment," but Mother declined. Mother claimed that she declined further residential treatment because the caseworker told her that she needed to show she could cope "on the street" without drug use. The caseworker denied telling Mother that she needed to cope "on the street."

At the next permanency hearing, Mother was ordered, but failed, to provide a sample for drug testing. At the next hearing, one month later, Mother tested positive for cocaine. At two subsequent hearings, one in October and another in January, Mother also tested positive for cocaine. At the time of trial Mother was a full-time student at San Jacinto College and lived in an apartment.

Floyd was placed in a foster home that was willing to adopt him. Floyd has no special needs, and all of his needs are being met by the foster family. In the foster home Floyd has "finally been stable." He has a strong bond with the caregiver and the caregiver also has another child with whom Floyd has bonded. The other child is eleven years old and is also adopted. Floyd, who was seven at the time of trial, goes to school, goes to the YMCA where he is learning to swim, and has learned to ski.

The foster father is a single parent who earns a good income as the owner of an art gallery. He has also fostered one older child who is now an adult and has moved out of the house. The home has two big dogs with a nice yard.

The caseworker referred to the family evaluation conducted by the Children's Crisis Care Center. In that evaluation, Mother admitted her substance abuse caused her to lose her son and she needs to "change her life."

The Child Advocate testified that termination was in Floyd's best interest. The

Advocate based this opinion on monthly visits with Floyd and conversations with his teacher. Floyd seems very happy in his foster home, and is "doing excellent" in school. The Advocate also testified that, if it were possible, she would like to see Floyd stay in his foster home and give Mother a little more time to "get her act together." The Advocate admitted she did not have any expert knowledge of addiction and what might happen if Mother was unable to maintain her sobriety.

When Mother testified at trial she did not deny her past drug use. Mother admitted relapsing after residential treatment, but testified that she began a twelve-step program after that relapse. Despite a positive drug test in October 2017, Mother claimed she had been sober since September 23, 2017. Since the October relapse, Mother tested positively for Valium. Though Mother had a prescription for Valium, she admitted that, as part of her recovery, she was not to take any habit-forming drugs, such as Valium. Mother's mother (Grandmother) initially referred Mother to the Department, but was willing to help Mother maintain custody of Floyd.

At the conclusion of trial, the trial court granted the Department's request to terminate both parents' rights. The trial court terminated Mother's rights on grounds of endangerment and use of a controlled substance that endangered the health or safety of the child. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), and (P). The court further found that termination of Mother's rights was in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001(b)(2).

## II.    ANALYSIS

In a single issue, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination is in the child's best interest.

## A.    Standards of Review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

Due to the severity and permanency of terminating the parental relationship, Texas requires clear and convincing evidence to support an order terminating parental rights. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *In re J.F.C.*, 96 S.W.3d at 264.

The heightened burden of proof in termination cases results in a heightened standard of review. *In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.). We review the legal sufficiency of the evidence by considering all evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d at 336. We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *Id.*; *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th Dist.] 2014, no pet.). However, this standard does not compel us to disregard all evidence weighing against the finding. *In*

*re D.R.A.*, 374 S.W.3d at 531. Because of the heightened standard, we also must be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id*.

In reviewing the factual sufficiency of the evidence under the clear-and-convincing burden, we consider and weigh all of the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. We give due deference to the fact finder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

In a proceeding to terminate the parent-child relationship brought under section 161.001 of the Texas Family Code, the petitioner must establish, by clear and convincing evidence, one or more acts or omissions enumerated under section 161.001(b)(1), and that termination is in the child's best interest under section 161.001(b)(2). Tex. Fam. Code § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

## B. Predicate Termination Grounds

Mother concedes the evidence is legally and factually sufficient to support the trial court's findings of endangerment and use of a controlled substance in a manner that endangered the health or safety of the child. Unchallenged fact findings are binding on us "unless the contrary is established as a matter of law, or if there is no evidence to support the finding." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *see In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) (unchallenged findings of fact supported termination under section 161.001(1)(O) because record supported those findings).

11

We have reviewed the record and conclude the record supports the unchallenged findings. We conclude the evidence is legally and factually sufficient to support the trial court's determination that termination of Mother's parental rights was justified under sections 161.001(b)(1)(D), (E) and (P) of the Family Code. *See In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266.

## C.     Best Interest of the Child

We turn to Mother's legal and factual sufficiency challenges to the trial court's best-interest finding.

The trier of fact may consider several factors to determine the child's best interest, including: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parents' acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *see also* Tex. Fam. Code Ann. § 263.307(b) (listing factors to consider in evaluating parents' willingness and ability to provide the child with a safe environment).

Courts apply a strong presumption that the best interest of the child is served by keeping the child with her natural parents, and it's the Department's burden to rebut that presumption. *In re D.R.A.*, 374 S.W.3d at 531. Prompt and permanent placement in a safe environment also is presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a). A finding in support of "best interest" does not require proof of

any unique set of factors, nor does it limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371-72.

### 1.     *Desires of the child*

At the time of trial Floyd was five years old.  When a child is too young to express his desires, the fact finder may consider that the child has bonded with the foster family, is well cared for by the foster family, and has spent minimal time with a parent.  *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).  The record reflects Floyd has been placed with the foster father for more than one year.

### 2.     *Present and future physical and emotional needs of the child*

While some children may have extraordinary physical and emotional needs requiring extra care, all children have physical and emotional needs that must be met on a daily basis.  Mother has not provided for Floyd's past or present physical and emotional needs.  Mother neglected to take Floyd to school more than twenty times during a six-month period.  Floyd originally came into care due to an allegation of sexual abuse evidenced by sores on Floyd's genitals.  The foster parent is meeting Floyd's needs and is willing to adopt him.  The record reflects that before coming into foster care, Floyd was living with Mother, who reportedly had several visitors to her home and associated with homeless and transient people. A fact finder may infer from a parent's past inability to meet the child's physical and emotional needs an inability or unwillingness to meet the child's needs in the future.  *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

### 3.     *Present and future physical and emotional danger to the child*

Mother argues that if the Department thought Mother posed a danger to Floyd it would not have permitted Mother to have access to Floyd.  The record reflects,

however, that Mother tested positive for illegal drug use throughout the pendency of the case including after Floyd had been removed, and she knew she was to remain drug-free to obtain his return. The results of her drug tests were admitted into evidence without objection. The record reflects that Mother had a long history of illegal drug and alcohol dependence, which began before her children were born, continued during her pregnancies, throughout the children's young lives, and while she was subject to the conditions and terms of the Department's family service plan. The record demonstrates that Mother continued to use illegal drugs and alcohol even with the knowledge that by doing so she was risking her own incarceration and inability to care for her child, as well as the termination of her parental rights.

Evidence of a parent's unstable lifestyle, including habitual drug and alcohol use, can support the conclusion that termination is in the child's best interest. *In re A.R.M.*, 14-13-01039-CV, 2014 WL 1390285, at *10 (Tex. App.—Houston [14th Dist.] Apr. 8, 2014, no pet.) (mem. op.). Although a reasonable fact finder could fairly credit Mother's alleged progress and decide it justified the risk of preserving the parent relationship, we cannot say the trial court acted unreasonably in finding the child's best interest lay elsewhere. *See In re M.G.D.*, 108 S.W.3d 508, 514 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). It is not our role to reweigh the evidence on appeal, and we may not substitute our judgment of the child's best interest for the considered judgment of the fact finder. *See id.* at 531 (Frost, J., concurring).

4.   *Parental abilities of those seeking custody, stability of the home or proposed placement, and plans for the child by the individuals or agency seeking custody*

These factors compare the Department's plans and proposed placement of the child with the plans and home of the parent seeking to avoid termination of the parent-child relationship. *See In re D.R.A.*, 374 S.W.3d at 535.

Mother continued to use drugs after Floyd was removed from her care. Mother

14

contends she needs more time to complete services and demonstrate a safe and stable home. However, Mother was not candid with the court with regard to drug usage and her reasons for positive drug tests. The evidence does not indicate a stable home or adequate parenting skills on Mother's part.

In contrast, the foster parent is meeting Floyd's emotional and physical needs, and is willing to adopt him. Floyd has bonded not only with the foster parent, but with an older child in the foster home. The foster parent's older child was adopted a few years earlier and is also bonded with the foster parent. The foster parent adopted an older son who is now an adult and has left home.

5.  *Programs available to assist in promoting the child's best interest*

In determining the best interest of the child in proceedings for termination of parental rights, the trial court may properly consider that the parent did not comply with the court-ordered service plan for reunification with the child. *See In re E.C.R.*, 402 S.W.3d at 249. The caseworker testified that Mother failed to complete her family service plan. Although Mother contends she completed some services of the plan, the evidence established that she did not fully complete the plan.

Mother's failure to complete the court-ordered service plan demonstrates that she is unwilling to take advantage of the services offered to her by the Department and casts further doubt on her parenting abilities. *See In re I.L.G.*, 531 S.W.3d 346, 355– 56 (Tex. App.—Houston [14th Dist.] 2017, pet. denied); Tex. Fam. Code § 263.307(b)(10), (11).

6.  *Acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate, and any excuse for the parent's acts or omissions*

In reporting to the 4 C's analyst, Mother acknowledged daily use of methamphetamine, crack cocaine, alcohol, and marijuana. Mother claimed her positive

drug test from the Department for amphetamine was due to prescribed medication for ADHD. The 4 C's analyst noted that at the time of the assessment, approximately ten months before trial, Mother had used drugs within days of the assessment and was struggling with a void in her life, which was noted as "a contributing factor to her poor partner choices and interferes with her ability to direct more attentions towards her mental health and recovery." The analyst recommended referral to the Drug Court program to provide Mother with structured, therapeutic, and comprehensive services that promote accountability. Mother was receiving mental health treatment, but had a history of returning to illegal drug use when she was unable to maintain her psychiatric treatment.

At trial, Mother alleged she needed more time to become stable and complete her services. Mother, however, had not demonstrated a reliable history of compliance with treatment. Mother was not candid with the court with regard to drug usage and her reasons for positive drug tests.

As with the previous factor, Mother's history of drug abuse and its attendant unstable lifestyle, plus her continuing narcotics use while this case was pending, supports the trial court's best-interest finding. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) (explaining that parent's history of drug use is relevant to trial court's best-interest finding); *In re C.A.J.*, 122 S.W.3d 888, 894 (Tex. App.—Fort Worth 2003, no pet.) (concluding that a parent's continuous drug use, unstable lifestyle, and criminal record supported best-interest determination); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86–87 (Tex. App.— Dallas 1995, no writ) (allowing fact finder to give significant weight to parent's drug-related conduct in making a best-interest finding); *see also* Tex. Fam. Code Ann. § 263.307(b)(8) (providing that, in determining best interest, courts may consider history of substance abuse by child's family or others who have access to the child's home).

Viewing the evidence in the light most favorable to the judgment for our legal-sufficiency analysis and all of the evidence equally for our factual-sufficiency analysis, we conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of Mother's parental rights was in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2). We overrule Mother's sole issue.

## III. CONCLUSION

Based on the evidence presented, the trial court reasonably could have formed a firm belief or conviction that terminating Mother's parental rights was in Floyd's best interest so that he could promptly achieve permanency through adoption. *See In re T.G.R.-M.*, 404 S.W.3d 7, 17 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *In re M.G.D.*, 108 S.W.3d at 513–14.

We affirm the decree terminating Mother's parental rights and naming the Department managing conservator.

/s/     Kevin Jewell
        Justice

Panel consists of Justices Donovan, Wise, and Jewell.