# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00239-CV

---

**S. W. and M. S., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 146TH DISTRICT COURT OF BELL COUNTY
### NO. 319,539-B, THE HONORABLE CHRISTOPHER L. CORNISH, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

M.S. (Mother) and S.W. (Father) appeal from the trial court's decree terminating their parental rights to their daughter "Lily," who was born August 25, 2020, and was about eighteen months old at the time of trial.[1]  *See* Tex. Fam. Code. § 161.001(b).  Both parents challenge the finding that termination is in Lily's best interest, and Father also challenges the finding of statutory grounds.  We affirm the trial court's termination decree.

### EVIDENTIARY AND PROCEDURAL SUMMARY

In late August 2020, the Department sought and was awarded conservatorship of Lily, alleging that Mother could not provide a safe home for the newborn.  At the time, the Department had an open case related to Mother's older children "Xander," born in

---

[1]  For the child's privacy, we will refer to her by an alias and to her family members by their relationships to her or by aliases.  *See* Tex. R. App. P. 9.8.

September 2018, and "Jules," born in December 2017. Lily was placed with Father but was removed and placed in a foster home when Father tested positive for cocaine in a hair-follicle test in February 2021.

In July 2021, the Department changed its goal from reunification with Father to unrelated adoption "due to the lack of progress in this case by her mother and father." The Department explained that Father had "not accepted any responsibility" for the positive test for cocaine, "claiming he must have been drugged." Despite changing its goals, the Department and the parents entered into a Mediated Settlement Agreement (MSA) in August 2021, under which Father agreed to complete a drug and alcohol assessment (OSAR) by the end of August, participate in counseling, install a Soberlink device on his vehicle at his own expense, and complete a psychological evaluation. He completed the psychological evaluation in September 2021 but did not complete the OSAR or engage in counseling until December, although he made an earlier attempt at counseling but was discharged for lack of attendance. The case proceeded to a final hearing that took place over several days in January and March 2022.

The Department introduced into evidence the November 2018 removal affidavit filed in the case related to Mother's older children, the December 2020 decree of termination signed in that case, its removal affidavit filed in Lily's case, a January 8, 2021 safety plan, and the Affidavit of Disruption filed when Lily was removed from Father's care in February 2021. In the removal affidavit related to Xander and Jules, Department investigator Kendra Estep averred that the Department had received a referral alleging neglectful supervision because Xander, who had been in the NICU since his birth about three weeks earlier, was ready for discharge but "cannot be discharged due to not having a safe home to go to and his mother failing to learn how to adequately feed and care for him." Mother had informed the hospital that

2

she was homeless and was staying with her mother, with whom she had a "domestic violence relationship." In addition, Mother had "repeatedly failed to stay for feedings" at the NICU to learn how to feed Xander, and during an overnight visit shortly before the report was made, hospital staff had observed that she "cannot properly feed" the infant. Further, Mother had told hospital staff that she could not visit or stay at the NICU because she had to care for Jules, but Mother's mother ("Mary") had since informed the staff that Jules had been in her care and that Mary had been under the impression that Mother had been staying at the hospital with Xander. The affidavit also stated that Mother had told NICU staff that she had been denied access to the hospital's overnight room when she in fact had been given access but had attempted to bring a man who was not Xander's father and then got upset and left when staff "told her that was inappropriate." During her interview with Estep, Mother described her arguments with Mary, saying that although they had never physically hit each other, "things do get thrown around." Mother also said that Mary's boyfriend used cocaine and is violent and abusive to Mary and occasionally to Mother. Mother told Estep that "she has tried to stab her mother . . . three times because she either wants to kill her mother or kill herself at this point due to the stress her mother causes." Mother also said that she had suffered from postpartum depression since giving birth to Jules in December 2017, that the medication she had been prescribed was not helping, and that she had stopped taking it. She described a suicide attempt in December 2017 in which she took about forty ibuprofen tablets "in an attempt to kill herself, but it only made her sleep for a while." She made the attempt while Jules and Mary were present and never told anyone about it.

In the Department's removal affidavit in Lily's case, Carla Gersna averred that the Department received a report in late August 2020 that Lily had been born prematurely that morning and had required oxygen and an IV "to assist in breathing due to fluid being removed

3

from her lungs at birth." Lily was transported to another medical facility's neonatal intensive care unit (NICU) "due to labored breathing and the facility's ability to meet her needs," and two days later, the Department was informed that Lily would be able to be discharged in two days. However, Gersna did not believe Mother could properly supervise or care for a newborn and recommended that Lily be placed with Father, who had tested negative for illegal substances and had an appropriate home for a newborn. Father denied knowing that Mother had an open CPS case and said he was "willing to supervise [Mother's] visits and submit to random alcohol testing." He also told Gersna that he was in a relationship with Mother but said he would not sign Lily's birth certificate without a paternity test.

Gersna summarized the circumstances surrounding Xander and Jules's removal and averred that Mother was initially allowed overnight visitations with those children. However, in the summer of 2019, Mother informed the Department that eighteen-month-old Jules "was talking back" and had "yanked away," falling onto the floor, and that Jules "could not move her arm above her head" that night, although she was fine the next morning. Mother "asked the caregivers to come pick up the children and [said] that 'she could not do it anymore,'" so her visitation reverted to being Department-supervised. In addition, Mother had "tested positive for Cocaine and Alcohol during her open CPS case"; had missed fourteen tests between February and May 2020; and tested positive for alcohol in July 2020, while pregnant with Lily. Gersna explained that the Department had concerns about Mother continuing "to test positive or miss testing for illegal or harmful substance[s] during her open CPS case" and about her ability to care for an infant. She also noted that a psychiatric evaluation from early 2019 stated that Mother "is not competent to care for a newborn, and this examiner certainly disagrees with any notion of [Mother] living independently and car[ing] for two small children," and that other

4

mental-health professionals expressed concerns about Mother's parenting abilities "due to her destructive behaviors and lack of emotional maturity." Mother's psychological evaluation from late 2019 stated that her intellectual functioning was "within the low average range" and that she showed signs of depression and recommended that Mother engage in individual therapy. The Department was seeking termination of Mother's rights, and a final hearing was set for September 2020.

The Department's January 2021 safety plan stated that Father had "knowingly left [Lily] unsupervised in the care of" Mother, which would place the child at risk of harm or neglect if it happened again. The Department expressed concerns about Mother's "continued positive alcohol drug testing results and her inability to address the behaviors leading to the removal of her children" and instructed Father not to leave Lily in Mother's unsupervised care.

Gersna's February 22, 2021 Affidavit of Disruption states that the Department received a report in January alleging that while Father was intoxicated, Lily fell off a couch and landed on her face. The report also alleged that Father "has been physically violent towards" Mother and that there was a gun in the home. When Gersna visited, she did not see any marks or bruising on Lily, and Mother and Father denied the allegations about domestic violence and a weapon. Gersna asked the parents to "refrain from alcohol consumption, as it appeared to be a heightened concern," and Father agreed. On February 1, Mother tested positive for cocaine, and on February 11, Father tested positive for cocaine in a hair-follicle test, at which point Gersna removed Lily from his care. Father denied all drug use and showed Gersna his prescriptions, but Gersna informed him "that these prescriptions would not cause a positive for Cocaine." Gersna averred that Father was "visibly emotional" but cooperative, providing clothing, diapers, formula, and other essential items for the child and giving Gersna "pertinent information" about

5

Lily. Gersna noted that Lily was asleep in her crib covered with a blanket and reminded Father about "Safe Sleep" and that it was safer to use "warmer clothing such as footed pajamas" to keep the child warm, but he insisted that the baby would be fine, "shout[ing] that 'she was not going to suffocate'" and telling Gersna that he and his older children "were in and out of the room."

The Department also introduced Father's 2017 and 2018 judgments of conviction for charges of driving while intoxicated (DWI), the parents' family service plans, and the parents' psychological evaluations. Father's evaluation states that he had been "open and forthcoming about circumstances leading to the current CPS case," did not show symptoms of mental illness, and "appeared to have some defensiveness and to downplay the seriousness of his problems." The "concerns and risk factors" included Father's criminal history, ineffective coping skills, history of "marital problems particularly related to poor communication skills," "[p]oor cognitive problem-solving skills," and limited insight into his issues. The psychologist opined that Father "should be challenged to go deeper in counseling sessions in order to develop more insight that can lead to more self-control in the future" and stated that Father would "benefit from a short course of therapy to discuss issues with the CPS investigation, relational issues, and other concerns that may surface," as well as parenting classes "with a focus on understanding the impact of ongoing parent conflicts on children."

Mother's psychological evaluation reported "a high level of defensiveness" and stated that she "may not have answered in a completely forthright manner." Mother "described her thought processes as marked by confusion, distractibility, and difficulty concentrating," she seemed to see "little need for changes in her behavior," and she might "have problems communicating clearly with other people." The psychologist stated that Mother's intellectual

6

functioning was "within the low average range" and concluded that Mother should continue with "individual therapy until discharged by her therapist."

Finally, the Department introduced its drug and alcohol test results for the parents. Mother tested positive for alcohol twice in early January 2020 and once in early July 2020, all while pregnant with Lily; positive for alcohol in September, October, and December 2020 and in January, February, May, June, July, August, and September 2021; and positive for cocaine in August 2019 and January 2021. She had a "negative-dilute" result in March 2021. Father twice tested positive for cocaine in hair-follicle tests performed in February and September 2021 and repeatedly tested positive for alcohol between March and September 2021. Father introduced the results of a January 2022 hair-follicle test that was negative for all substances.

Department conservatorship worker Melat Mekonnen testified that Lily was removed because the Department "had an open case with [Mother's] previous children," her parental rights to whom were later terminated; Mother had tested positive for alcohol while pregnant with Lily; and the Department had concerns about Mother's "mental health and a psychiatric evaluation that stated she was unable to care for small children." Mekonnen testified that Mother had not been honest about her drug and alcohol use in her psychological evaluation, had been diagnosed with alcohol abuse in a psychiatric evaluation, and had never acknowledged to Mekonnen that she has a drug or alcohol problem. Lily was released to Father from the NICU but was removed after the Department received reports alleging that Father had been intoxicated while caring for Lily, who had fallen off the couch and hit her head; that Father had left Lily unsupervised in Mother's care; that Mother had a positive urinalysis test for cocaine; and that Father had "a positive hair strand test for cocaine."

7

When Lily was removed, she had COVID-19 and bronchiolitis, she was overweight, and "she appeared to have developmental delays." Lily was placed in a foster home, where she remained throughout the case. The Department had considered both grandmothers as possible placements, but Mekonnen said that Father's mother ("Linda") "denied placement when asked," and that Mary was ruled out because she tested positive for cocaine and due to "the reports of domestic violence between" her and Mother.

Mother told Mekonnen that she and Father had lived together until November 2021, although she never admitted that she had lived with him during the monitored return. Mother said that she had "lied in order for the Department to continue the path of reunification with" Father. In addition, Mekonnen had seen women's shoes in Father's bedroom, and he told her that the shoes were Mother's, although he never admitted that she was living with him. Mekonnen did not recall seeing any other women's items at the house and conceded that Mother might have left the shoes behind. In November 2021, one day after Mother told Mekonnen "that she was moving out and she was going to be getting her new apartment," Mother was arrested for assaulting Father, but neither parent reported the incident to the Department.

Mekonnen testified that during Mother's weekly visits with Lily, she was "observed to have difficulties" feeding Lily or trying to change her clothing. Mekonnen also said that Mother, who had been ordered to engage in individual therapy, had had three or four therapists during the pendency of the case—she was discharged from the first two for lack of attendance, and the third discharged her after one session because Mother did the session while in a moving car with other people and was "dishonest" when asked who was in the vehicle with her. Mother had been seeing her current therapist since late October or early November 2021;

8

she had not had any positive drug or alcohol tests since September 2021; she had been employed at the same job since November 2021; and her apartment was safe and suitable for a child.

Mekonnen testified that Father tested negative in his alcohol and drug tests until January 2021, when he tested positive for alcohol and Mother tested positive for cocaine. In February 2021, Father's hair-follicle test was positive "for cocaine, benzos and cocaine metabolite," and Lily was removed from his care. Mekonnen said that Father had declined an early offer of individual counseling but admitted that therapy was not required of him until April 2021. Until that point, Mekonnen testified, "there were no services provided to [Father] in connection with any positive drug test results or alcohol results." She also agreed that he was not provided any services "in connection with alcohol consumption or the positive cocaine test result until July 2021," by which point the Department changed its goal from reunification to adoption.

Mekonnen agreed that although the Department's July 19, 2021 permanency report stated that the goal had changed from reunification to termination, the Department believed at that time of the MSA "that it was in the best interest of the child not to terminate" the parents' rights. She explained, "It was my understanding that the primary goal was unrelated adoption and the concurrent goal was family reunification with the hopes of the goals changing following the Mediated Settlement Agreement." Father agreed in the MSA to abstain from alcohol, complete a drug and alcohol assessment (OSAR), and engage in therapy. Since then, however, Father had tested positive for alcohol multiple times. In addition, he had not begun therapy or completed an OSAR until December, telling Mekonnen "that he did not have a substance use problem and did not want to—he did not want to lie and say he did just because the Department wants him to." Father was not referred to any resources after completing the OSAR.

9

Mekonnen testified that Father had submitted to most drug tests requested by the Department and "has been positive for alcohol and cocaine," including positive results for cocaine in hair-strand tests in January 2021 and September 2021. Since Lily's removal, Father had "very frequent" results for alcohol, with weekly positive tests from April to July. Father also tested positive for cocaine in September and had two positive alcohol tests on September 27 and October 6 but had "tested negative for everything" since then. Mekonnen testified that because of his two DWI convictions and his frequent positive alcohol tests, the Department was concerned that Father is addicted to alcohol. She noted that Father's psychological evaluation "state[d] a concern of coping skills" and said that the Department had concerns that he uses drugs or alcohol as a coping mechanism, which could significantly impair Lily's well-being.

Although Father was ordered to start counseling in April 2021, he did not receive a referral until August. Mekonnen thought the delay was initially "due to the counseling office having a wait list, however he was then able to make an appointment and they were having difficulties reaching him, and once they did he was a no-show for his appointment," at which point he was discharged "for not calling back." Father told Mekonnen that he never got a link from the therapist and that when he called to get a link, "no one answered or got back to him," but the therapist's office's system showed that a link was sent. Father was referred to his current therapist in December, at which point he began to engage in regular sessions.

Father missed only three visitations, but Mekonnen said, "We have observed concerns with him appearing to be lethargic in his visits." However, she could not recall which visits raised concerns about Father's lack of interaction, saying that it occurred "several" times and that either she or other facilitators had made the observation, and she could not point to any notes about such concerns. Mekonnen's notes from a September 2021 visit did not mention

10

Father being lethargic and instead indicated that when Lily started to cry, he stood up and tried to get her to play. In addition, Father "appeared happy to see her. He hugged and kissed her," and he "adhered to the visit's expectations." She also acknowledged that Father was more interactive in his two in-person visits in December, before the Department reverted to virtual visits due to COVID exposure. Mekonnen testified that that Father "does his best to bond with" Lily, who seems to be "getting more comfortable" with him and did not cry when left with him during his last visit. Mekonnen agreed that since September 2021, there have been no concerns about Father's parenting skills, employment status, his ability to provide a safe and stable home, or his bonding with Lily. In addition, he complied with the requirements that he engage in therapy, undergo a psychological evaluation, and follow its recommendations. Although Father's home was safe, clean, and appropriate, Mekonnen had concerns because Lily has asthma and Father's home "smells like smoke when you walked in." Father told Mekonnen "[t]hat his kids are not here, so he smokes inside the house, but he would stop when or if [Lily] was returned."

Lily had been in the same foster home for almost a year, and Mekonnen testified that she and the foster parents appeared to be closely bonded:

> [Lily] is visibly excited every time she sees her foster parents. She seems—she appears to be uneasy even with—in my care, and she has been observed to have separation anxiety where she will cry for a while when she initially leaves her foster parents. She does refer to her foster parents as dada and mom, so—and she just is a lot more interactive when with them.

Mekonnen wrote in one of her reports that Lily was "hard to console for days" after visits with the parents and that she was "smiling, laughing when picked up" by her foster parents and "appear[ed] that she's excited to see them." The foster parents reported that after visits, Lily "does not want to be left alone" and "wants to be within eyesight of" her foster parents, she "gets

11

visibly upset and will cry" when her foster parents leave the room at bedtime, and the foster parents "have had to spend nights on the floor in her room because she wasn't able to go to sleep without them being present." Lily's foster parents were meeting all her emotional and physical needs and making sure she attends all medical and physical-therapy appointments. They wanted to adopt her and were willing to continue supporting Lily, and Mekonnen said that if Father's rights were not terminated, the foster parents were willing to continue as Lily's permanent managing conservators.

Debbie Belviy was the guardian ad litem for Mother's older children and had recommended termination of Mother's rights to Xander and Jules. She was appointed as Lily's guardian ad litem in August 2020. When Belviy visited Father and Lily in September 2020, her main concern was that Lily was sleeping under blankets, and Father said that he had received information about safe sleep from the Department and the hospital. During another visit several weeks later, "[t]he baby was covered in blankets again, and we had the discussion again about safe sleep." In early November, Belviy called to check in and heard Mother in the background. When Belviy asked how often Mother was having visits, Father "said she was visiting a couple of hours a day, and then mom yelled in the background. She said, 'Don't lie. I'm here 24/7.'" Belviy called the Department caseworker, who later reported that she had found Mother alone with Lily and that the Department was putting into place a safety plan.

Belviy "[a]bsolutely" agreed with the Department's decision to remove Lily after Father's hair-follicle test was positive for cocaine. Further, when Lily was placed with her foster home, Belviy said, "her leg strength was not very good. She was not sitting up good, not like she should be." The foster parents did an early childhood intervention, which resulted in a referral to physical therapy to strengthen Lily's legs.

Belviy observed one in-person visit between Lily and Father. She said that Lily "was very eyes-on the foster mom. Wherever the foster mom went, she had eyes on her. She was kicking her little legs like she was real happy and everything. She is very bonded to foster mom." When Lily "realized where she was, she started screaming," so Father "took her and he was holding her and patting her, and she would calm for a few minutes and then she would start screaming again," at which point he would pat her again. Father eventually calmed Lily and got her sitting up, eating cereal, and watching a video on his phone. "[S]he would just start crying for no reason, and then he would try to console her, and after a little bit she would stop again, and then . . . it was just intermittent like that for a while." Father "looked very uncomfortable," but Belviy did not know if he was uncomfortable with Lily or because Belviy was observing.

Belviy was concerned about Father continuing to drink while caring for Lily and after the August 2021 MSA; his prior DWI convictions; his honesty throughout the case, including his failure to tell his counselor that he had been testing positive for alcohol and his failure to admit to the Department that he and Mother were living together in November 2021; and his history of domestic violence with Mother and the mother of one of his other children. Belviy believes Father "has an alcohol problem" and might pose a danger to Lily if he does not address it. She also noted that after the MSA, "[t]here were things that were supposed to be done and they weren't done," and that Father tested positive for alcohol in September after agreeing to stop drinking. Although Father's recent progress indicated that he was "starting to move in the right direction," Belviy had "concerns that he didn't actually kick it in when we agreed that he was not going to do all this and we could increase his visitation and everything else. He just wasn't taking it seriously for some reason and that bothers me." She acknowledged that Father's OSAR had determined that he did not need services but also noted that a parent must be honest

for an OSAR to be accurate because "[i]t is self-reporting, and if a person does not believe they have a problem and don't report it as an issue, then it's not picked up that way."

Belviy testified that Mother has not been truthful with her since "the first time I talked to her" and said, "I know she's trying to get herself stable, but I don't think she's there yet." Asked whether Mother had "ever been this clean" in her earlier case, Belviy said she thought Mother had "gotten pretty clean" to the point that the Department had allowed weekend visits but that "some mental health issues kicked in at that point"—explaining that after some weekend visits, Mother had called the Department to say, "I'm having troubles."

Belviy agreed "that it's in the best interest of a child to be placed with relatives" and admitted that she never contacted any of Lily's relatives, including her paternal grandparents or a maternal aunt, as possible placements. She also said that there was no reason why she did not call any relatives and acknowledged that it was part of her duty "to investigate and to interview anybody that you think has any facts in the case." However, the possibility of relative placements did not change her recommendation because "they are also aware that there's a CPS case going on, and my concern is if you're so concerned about your grandchild, why haven't you contacted us to try to get placement of your grandchild."

Belviy agreed that Mother had been working services and that visitations have gone well. She also knew that Father had recently passed a hair-follicle test but said that although those results indicated "that he's finally decided to take this seriously," they did not change her recommendation. Belviy thought that Father should have made changes about a year earlier "because that's about when his child was removed from him. He should have started then. So I just don't think that this is a long-lasting thing. I hope it is for his sake, but I just don't have a lot of faith in his motivation." Belviy thought that it "would take a long time" to

14

prove that Father was a safe parent by showing his "[l]ong-term sobriety" but that "we don't have a long time." Belviy did not believe either parent could provide Lily with a stable home or meet her physical and emotional needs, did not think either parent had demonstrated an ability to safely parent Lily, and thought it "very probable" that Lily could be developmentally delayed if returned to the parents. Belviy testified that Lily's best interest "would be served by staying with her foster parents and being adopted by them and making a life for herself with them." Belviy had observed Lily in the home and said that Lily was "very" bonded to her foster parents, who were meeting all of the child's needs. Belviy did not have any concerns about the foster home and testified that she has no doubt that termination and adoption was in Lily's best interest.

Karyn Epstein, an early intervention specialist, testified that she had been providing therapy to Lily since April 2021, when she was seven months old. Lily started the program "testing for milestones basically around two and three months old"—she was not "quite sitting up on her own yet," "grabbing for toys like we would expect her to," answering to her name, holding her own bottle, rolling over, or bearing weight on her feet when held in a standing position. Epstein said there was "no actual way to tell" why she was delayed, but in her experience, "it usually comes from lack of experience." Lily "is now walking, talking, eating on her own, using utensils, running around," and Epstein testified that the foster parents had "done everything we have asked and more. They are usually asking for even more things that they can do during the week." Epstein agreed that Lily was "now almost developmentally on target" thanks to her work with Epstein and to the foster parents' efforts.

Lily's foster mother, "Claire," is a psychologist who has worked with children in the past. Lily had lived with her, her husband, and her two children for a year, since she was five and one-half months old. At placement, she was overweight and "quite a large baby." She "had

15

a horrible, horrible cough" and made a "gurgling kind of a sound or a breaking kind of sound" when she breathed and was diagnosed with bronchiolitis and asthma. In addition, Lily was not rolling over or starting to sit up on her own, she had a bald spot on the back of her head, and she would not try to push up on her arms when placed on her belly. Lily was placed into physical therapy and a program aimed at helping her reach expected developmental milestones. The therapists provided strategies to work on at home, which Claire and her husband use "throughout the day with her in everything we do, from the way we communicate with her to the way we watch her, the toys we give her to play with, and, you know, the way we watch her move around the house." Lily attends a daycare that provides "different kinds of . . . educational activities," and the family has established morning, bath, and bedtime routines.

Claire testified that she brings Lily to and from in-person visits with the parents:

> Typically, after the visits—when I first pick her up she's very excited to see me and wants immediately for me to pick her up, and then typically for a day or two she has an increased, kind of, desire for us to hold her, to be always next to her. She tends to get pretty upset if we kind of move out of her line of sight; if she's in her highchair, we move away, she can't quite see us. She really wants to be with us as much as possible.

She had observed a number of the parents' virtual visits and never saw anything inappropriate but said, "I haven't observed many parenting skills at all," explaining that she saw "[m]inimal interaction" during Father's virtual visits. She said Father's virtual visits usually only lasted for between seven and ten minutes, despite being scheduled for thirty minutes. Claire was asked why his virtual visits were so short, and she said:

> He seemed to end the visits whenever [Lily] demonstrated kind of—if she started to fuss or cry. I remember one time when she was—pretty early on she spit up,

16

and I was just cleaning her—her shirt, and he said, "Oh, well, I'll let you go so you can take care of cleaning her up," which, I mean, she just spit up a tiny bit. It was pretty typical for a—she was probably about seven months then. So it was typically something like that or just he would just end the visit for no, necessarily specifically, verifiable reason.

She said that he would typically tell Lily hello; "say, 'This is daddy'"; "tell her that he loved her, and say he wanted to see her soon, and that was about it. He didn't really, you know, comment on what she was doing or, you know, ask about her toy or even make comments about how she was interacting or engaging." However, Claire acknowledged that Lily was so young that she could not give him her exclusive attention during a virtual visit, particularly when provided with toys in person. Mother's early visits were similar, but she "began to interact more," asking questions or commenting about toys or Lily's clothing, and Claire said Mother's visits have improved and "have been appropriate and increasingly interactive." Claire expressed concerns about gifts Father had recently given to Lily because "everything that was made of cloth smelled of cigarettes," which was worrying because Lily "has asthma and allergies and we are concerned about what she might be exposed to." Further, Claire had doubts about the parents' ability "to be forthright and honest and to keep appropriate boundaries."

Claire and her family are bonded to Lily and want to adopt her. She, her husband, their sons, and their extended family were all "very attached to her" and "want her to have the best life she can have," and she thinks her family "can provide a loving, happy home for her." The foster family is willing to be permanent managing conservators and to "take on all of the financial responsibilities" for Lily if Mother and Father retained their parental rights.

Officer Heath Crum of the Killeen Police Department testified that in November 2021, he responded to a call about domestic violence at Father's residence. Crum interviewed

Mother, who said that "they'd been drinking that night and they got into an argument regarding who was head of the household." She reported that the argument had "escalated" from "verbal to pushing and she got tired of it, walked into the kitchen, grabbed a knife and told him that if [he] put [his] hands on her again that she's going to stab him." She told Crum that she and Father "continued arguing . . . and then from there he put his hands on her," explaining that "she basically goaded him into—or enticing him to come at her, and when he did, she lunged at him and cut the left side of his neck." Mother was arrested for aggravated assault on a family member because she told Crum that she and Father were in a dating relationship and "lived together." Crum never asked Father if he and Mother were dating or living together, nor did he know who had been drinking—Mother had referred to "they," and Crum said he "assum[ed] that she's referring to everyone in the household."

Mother testified that she worked at the same restaurant as Father and had been there for about three and one-half months, earning about $1,200 to $1,500 a month. She had been living in her apartment since mid-November 2021, and before that she "lived in my own house currently where [Father] is living." She testified that she moved in with him when the child was four or five months old and lived there for "[m]aybe a year or two" but also said that she had not lived with him during the monitored return, during which time Mother lived in her own place. Mother did not remember telling a psychologist that she had stopped taking antidepressants, and she testified that she was not taking medication for any mental health issues and had been told she did not need "MHMR."[2]

---

[2] MHMR stands for Mental Health and Mental Retardation. The Texas Department of Mental Health and Mental Retardation was abolished and replaced by the Department of State Health Services and Department of Aging and Disability Services. *See*

18

Mother testified that she and Father had ended their relationship about six months earlier because they "didn't see eye to eye on a lot of things," such as finances, but that she never had any concerns about his parenting and that "he's a great father." Mother had observed Father's weekend visits with his older children when she lived with him and said that he was "[v]ery bonded with them," they respect him, he "made sure they're fed and that . . . their hygienes were kept up," and "it was really good." Father did not drink while his older children were with him, he did not go to bars after work or invite friends over to drink, and he only smoked cigarettes outside. Mother testified that she also smokes cigarettes and agreed that smoking around a child with asthma is not a good idea.

Although Mother remembered telling the Department that she was concerned that Father was using marijuana while Lily was in his care, she testified that she never saw him use marijuana around the child. She only saw Father drink "[m]aybe a shot" once a week in the time Lily was in his care. She never saw Father use drugs, he never told her that he had used cocaine, and when he told her about his positive test, he denied that he had used the drug. Mother denied that she and Father had used cocaine together in January 2021. She also denied that she and Father are alcoholics, that she had a drug problem, or that she had attempted to avoid a positive test on the day she had a diluted result in March 2021. Mother was willing to complete a rehabilitation program to retain her parental rights and said she had successfully completed such a program in August 2021 and would "definitely be willing to do it again." However, Mother also agreed, "Correct. I guess," when asked, "So rehab isn't really going to be very successful if you can't admit that you have a problem, correct?" She later clarified that although she did not

https://www.sunset.texas.gov/reviews-and-reports/agencies/texas-department-mental-health-and-mental-retardation (last visited on Aug. 10, 2022).

19

believe she had an addiction problem, she was open to undergoing an OSAR evaluation to "discuss this further to determine whether" she had a problem.

Mother testified that she last used illegal drugs more than a year earlier, that she had not had a drink since September 2021, and that she would never drink again, saying, "It has ruined my life. I will never use it again ever. I'm on a straight path." She was not currently attending AA or NA meetings and did not believe she might relapse in the future, but when asked about her plan if she were to relapse, Mother answered, "I would go to AA meetings or I would join a rehab, but that is far from my brain right now. I would never relapse." Asked what had changed since her rights to her older children were terminated, Mother said that she now has transportation, employment, and housing, and she knows "for sure that I'm able to watch after her and feed her and bathe her and do everything I need to do as a parent." And although they are no longer in a relationship, she also has the support and assistance of Father and his family, with whom she gets along. Mother testified that she had looked into daycare for Lily and that she got benefits that could "provide me daycare and any other resources that I might need while I'm at work." Moreover, the parents' employer would allow them to work different shifts so they can care for Lily. Mother admitted that she had been arrested in November 2021 and charged with assaulting Father. That case was still pending at the time of the final hearing, and Mother refused to answer any questions about the allegations, invoking her Fifth Amendment privilege.

Father testified that he has three older children and that the Department had never been involved with those children, saying that if he had not had Lily with Mother, "y'all would never [have] known me." He testified, "I'm a great father and I don't have CPS problems. I'm not a drug addict. . . . I don't have any reason for CPS to be in my life other than the fact that I

had a child with somebody with CPS in their life already." Father said he did not know that Mother was drinking while she was pregnant with Lily, nor did he know she had a pending CPS case until the Department "walked through the door in the hospital." He said that although he knew Mother had children, she said they were with family members whenever he asked about them.

Father said that when Lily was in his care, he met all her needs and she was never left unattended. Father denied the Department's claims that Lily was developmentally delayed when she was removed, saying, "Yeah, that's totally false. . . . She was doing everything that a normal child her age was supposed to be doing, including playing on the floor." She was rolling over and could hold her bottle, and Father said that when she was about three months old, he started placing her in a jumper for exercise and play. Father also testified that he and Mother only lived together briefly, for "[a]bout a month" after he took over the lease to the house she lived in and before she moved into an apartment, and he denied that Mother had lived with him while he had custody of Lily. He admitted that he once left the two of them alone when he had to pick up his older children from school—Lily "was asleep, and the school was like two minutes away, so I figured I can just go get them and come back and there wouldn't be no problem"— and said "that was a mistake on my end" and that he told Gersna it would not happen again.

Father admitted that he drank alcohol and said that he last drank in September 2021. He also testified that he had told his therapist that he drank. He insisted he does not have a drinking problem and said he "drink[s] to be merry." Father noted that "alcohol was not a reason for the disruption of the monitored return" and did not understand why it had become a reason for the Department's request to terminate his rights. He said that since the positive test for cocaine, which he denied using:

21

I've just been on the straight and narrow working, coming home, working, working, working. I work a lot. And alcohol is legal. I was never formally told I couldn't—The only time they told me I couldn't drink is when she was in the home, which I didn't. That's not why y'all took my kid. So I was even given permission to have a Super Bowl party as long as my daughter wasn't in the home, which was—drinking was going to be there. Carla can attest to that, the first caseworker. So now all—after all this time it's, oh, you're an alcoholic now.

He said he was never positive for alcohol while he was Lily's primary caregiver except when he asked for and obtained permission to have a Super Bowl party. He admitted to two prior convictions for DWI, saying, "I couldn't afford a lawyer, so yes." Father also admitted that he tested positive on February 14, 2022, after drinking at a friend's party the night before.

Asked about the hair-follicle test that caused the Department to remove Lily from his care, Father testified, "I've never done drugs before in my life," and, "I can't explain it to you. Like, no drugs had ever been in my urine, so I'm flabbergasted that it could be in my hair." He "never knowingly did any drugs. . . . I thought I was slipped something . . . so my daughter could be taken. I thought it was all purposefully done," explaining that even before Lily was placed with him, he had called the Department and "told them they was going to start receiving phone calls making allegations against me because her mother didn't like the fact that I was getting [Lily] and she wasn't." Father also testified that Mary "told me blatantly out of her mouth that she was going to do everything possible for my daughter to be removed from me." In addition, he never saw Mother use cocaine, never had concerns about her having supervised visitation with Lily, and never saw someone using cocaine in front of him.

Father denied that he had been intoxicated and allowed Lily to fall off a couch during the monitored return. Father also said that although they both tested positive for drugs or alcohol in September 2021, he and Mother had not drunk alcohol or used drugs together since

22

Lily's removal. Father testified that in late February, he had done another OSAR evaluation, asking "[f]or a professional analysis" and "explaining in detail what was going on," and that the result "was still not referring me to any sort of outpatient or inpatient treatment. . . . I was not told to do any inpatient or outpatient rehab or AA or anything like that." He said he intended to continue therapy, and although he also said he did not know if he would continue therapy after the case concluded because he did not think he needed it, he agreed that counseling could help him and Mother co-parent.

Father admitted that he had been arrested twice for assault against the mother of one of his older children but denied that he was ever violent toward Mother. He testified about the November 2021 incident that resulted in Mother's arrest, explaining that Mother and his uncle came to his house. Father was frustrated about Lily's removal and "blamed" Mother, starting an argument that resulted in her getting a knife from Father's kitchen and threatening him with it before Father's grandmother took the knife away. Father did not believe Mother actually intended to harm him and told the police that he did not want to press charges. He said:

> I blamed her for my daughter being taken. I blamed her for the cocaine that was present in my hair follicle. Like, I've never partaken in any drug. And, like, I almost passed out when I got the test results that made my daughter get taken from me. So yes, I brought it to her. I was mad. Like, I continued to state this, that yes, I was angry, that I felt like she was the one reason why my daughter was taken.

At that point, he said, "her emotions of being, I guess you would say, getting blamed for it and she's denying it, made it blow up like it was, like it did." He denied that either he or Mother had been drinking and said that if Mother told Officer Crum that she and Father were in a dating relationship, it was not true. He also said that they did not push each other during the altercation.

23

Father was asked how he would make sure such an incident did not happen again, and he said that he would limit his interactions with Mother to co-parenting and that "we don't have to have the conversation about anything but our children." He also said that arguments about who was to blame for Lily's removal would not arise if Lily was returned. Further, Father and Mother are cordial at work, where they work in different areas, and he said that "at the end of the day it's not about me or her; it's about my child. And I'm—I'm—and she will never be in no harm's way ever. None of my kids will be." He did not believe a no-contact order between him and Mother was necessary but he was "willing to do it" if ordered to do so. Asked about a February 2022 social-media post in which Mother referred to him as her fiancé, Father said he did not know about it until he was told about it by a friend. He testified that he and Mother were no longer in a relationship; denied that they were engaged; and testified that he did not plan to resume the relationship after the case was resolved. Even if Mother had "different ideas of what's going to happen between" them, Father said, he did not believe it would affect their ability to co-parent or lead to another incident of domestic violence.

Father testified that he had looked into daycare for Lily and had a favorite because it was between his mother's home and his job. Father testified that he made enough money to take care of his bills, his children's needs, and his child-support payments. He said he did not have enough additional income to pay for a Soberlink device on his vehicle, as had been ordered by the trial court, but agreed that the device was one of the conditions of the MSA and said that he would figure out how to pay for it if the trial court required it as a condition of him retaining his parental rights. Father thought that "as a result of the Mediated Settlement Agreement [his] rights were not going to be terminated" and that he would get increasing visitation, and he said that his mother Linda helped with Lily and offered to be a placement, but the Department never

24

contacted her. Father also testified that Lily had grown more comfortable at visitations—his last visit ended with her giving him "a high five" and a kiss, and she no longer cries during visits, which he believed used to happen because "she probably didn't remember" him.

Linda observed Father when he had custody of Lily and said that he "showed that he cared for her, that he was making sure that he had what he needed for her, and to me, I felt like he was doing a wonderful job with her." He was "[a]lways loving, always attentive," and Lily always "looked healthy and loved." Linda is a substitute elementary teacher with a master's degree in special education, and she helped care for one of his older children when the mother of that child had an open CPS case. She testified that no one from the Department ever contacted her to ask if she wanted to be a placement for Lily. She would consider being a placement but said she never reached out to the Department because of "[p]ersonal reasons pertaining to" Mother and her family, saying, "I feel like they're disturbing, drama, they like to disrupt stuff, and I don't want that in my life." Linda testified that Father "demonstrates adequate and safe parenting skills," "loves his kids and he takes care of them." They were never abused or neglected, they never appeared to be afraid of him, and they were "a happy family." She knew Father drank, although she had never seen it impair his parenting abilities, and had "never seen him use drugs." She testified that she would support and help Father if Lily returned to his care, and she believed it was in Lily's best interest for Father to retain his parental rights and for Lily to be placed with him.

Therapist Dawana Flowers testified that she had been doing weekly sessions with Father since mid-December 2021 and that the Department had raised concerns about his "drinking, his ability to take care of his child, to make sure that he had all of the protective measures that he needed to have in order to be a protective dad." Flowers testified that Father

25

had engaged in therapy, arrived on time, had not missed any sessions, and "talks about what life was like before we came into his life with his baby. He talks about his other children, his love for his children, and how he takes care of his other children." Father told Flowers that he and Mother work in the same restaurant but said that they were no longer in a relationship. Flowers also testified that Father had explained that he had "a daycare plan for the baby" and that he "is not a new dad, so he has already had that experience raising other children."

Father told Flowers that Lily was removed due to "false allegations made against him that he had an excessive drinking problem, that he was not fit to take care . . . of the baby." Father admitted to his two DWI convictions and told Flowers that he had tested positive for alcohol twice and "does not have an alcohol problem." On cross-examination, Flowers testified that it was "surprising" to learn that Father had tested positive for alcohol every week in April, May, and June 2021, "almost every week in July of 2021, and then again in September of 2021, and October of 2021." She said that a parent will not be successful with therapy "if they're not being honest and the therapist is not aware of the problem or the situation" and opined that although alcohol and tobacco are legal, Father should "[a]bsolutely not" drink or smoke while caring for Lily, particularly in light of her asthma. Father admitted that he once tested positive for cocaine but did not tell her that it occurred while Lily was in his care. Flowers thought that positive test "was after the child was removed" and did not know "he was caring for the child when he tested positive." Flowers also did not know that Mother had tested positive for cocaine in the same time period and while Father was supervising her visitations and agreed that it would place Lily in danger if the parents were using cocaine together while caring for the child.

Father told Flowers he had taken a psychological evaluation but did not tell her that the psychologist expressed "concerns with his ability to have effective coping skills," and

26

Flowers agreed that if Father uses alcohol or illegal drugs to cope, he could place Lily at risk. Flowers said she "[a]bsolutely" still needed to cover drug abuse, alcohol abuse, and his lack of coping skills if Father was not honest about those issues. Flowers also testified that Father could not be a protective parent until he was ready to admit to a problem with alcohol or drugs and to "make some major changes" and that if he were "ever under the influence and caring for" Lily, he would "continue to be a danger to" the child. Flowers agreed that Father's therapy required "a lot more time" and recommended substance-abuse counseling, saying that if he did not "really work[] on the substance abuse," his prognosis "is not going to be good." Flowers knew Father had been ordered into therapy in July 2021 and said it would give her "concerns" if he had waited to start therapy until December. However, she added, "I don't know what was going on with [Father]. I don't know what was going on in his life at that time."

Flowers "[a]bsolutely" thought that Lily would be bonded to her foster parents and that her being away from Father and having primarily virtual visitation would "place a wedge" between Lily and Father. She explained that "you cannot bond over a computer screen and because of the baby's age, the eye contact, their attention span is not long enough for any bonding to take place. It's no—she doesn't even know how he feels probably anymore because it's been awhile, and . . . that's concerning."

Flowers did not think termination was in Lily's best interest and recommended that Father be given more time to prove "that he can be that protective parent." She said she knew "it's based on a limited time that I've been speaking with him" and testified, "I don't know about the back story. But since I've had him, I see his eagerness, his willingness to be a good dad or wanting to be a father to [Lily] because he has other children." On cross-examination, Flowers said she could not recommend reunification "based on what I just heard today":

27

Well, after hearing what I'm hearing today, [Father] would need, like I said, substance abuse counseling more intensely than just what we do. I mean, I can help him with protective parenting, holding him accountable, working with problem solving, coping skills, but the other piece of it is—that's the piece that's going to make or break the decision whether or not he's able to take care of his child drug/alcohol free for life.

However, she did not believe that Father's rights should be terminated. She thought that the fact that Father's negative drug and alcohol test results indicated that he was "already on the path to recovery." Flowers recommended that Father be given "a little bit of time, hold him accountable for it . . . and, hopefully, you know, he would be able to live drug and alcohol free."

Therapist Heather Penaflor testified that she had worked with Mother since late October 2021 and had discharged her successfully on January 31, 2022. Penaflor said that Mother attended all her weekly sessions and made "significant progress in regards to her life," obtaining full-time employment, a vehicle, and her own apartment and making "some really big changes in regards to that." Mother "fully engaged" with Penaflor, "always had a good disposition," and was open to learning from therapy. Mother told Penaflor about her plans if Lily was returned to her care, saying she had investigated daycare, made arrangements, and spoken to her employer about shifting her schedule.

Mother never told Penaflor that she lived with Father during the case but said in late 2021 that she had gone to a shelter to get away from her arguments with him and later said that she had moved into her own apartment "because she wanted to be away from him." In late November, she told Penaflor that Father "wasn't doing what he was supposed to, he wasn't following the plan, and so that she had to do everything on her own." Penaflor knew that this was Mother's second CPS case, and Mother had told her "very general" information about the first case but never "how they got removed from her care." Asked about concerns that she or the

28

Department had, Penaflor said that Mother had provided "conflicting information" about whether she was still in contact with Father. Further, although Mother did "very well" in her protective parenting class, "there was no way to monitor those skills and how they're applied when she cares for her daughter because [Penaflor had] not observed that." Mother had established a plan "for sobriety and to maintain the sobriety," and Penaflor never saw a reason to seek psychiatric help for Mother, nor did she recommend substance-abuse counseling because Mother "had established a plan that seemed to be working for her and didn't mention any struggles with it."

Asked whether contact with Mother would pose a danger to Lily, Penaflor said:

> That is a little difficult to speak on just because I've not observed the interactions that she has with the child. Again, as I've put in my notes, there's a little bit of reservation only because I've not been able to observe how she implements her— the protective parenting skills that she's learned in the curriculum, so that's— that's kind of where I'm at with that.

Penaflor expressed some concerns about Mother's cognitive abilities because "[t]here were times where she was unable to remember some of the things that we discussed in a previous session when she came to a later session" but also agreed that Mother had been able to maintain a full-time job and pay for her apartment and car. Mother never told Penaflor that she had tested positive for cocaine or alcohol during the case and "basically" told Penaflor "that all of her results were negative until that one time she told me it was diluted." She also never told Penaflor that she had tested positive for alcohol while pregnant with Lily or that she had been arrested for domestic violence against Father in November, a fact Penaflor said was "[v]ery" concerning.

At the conclusion of the hearing, the trial court verbally stated that it found that the Department had shown grounds as to Mother under Family Code Section 161.001(b)(1), subsections D, E, O, and M, and as to Father under subsections D, E, and O. The court further

29

stated, "I'm making a specific finding that I find the testimony of [Father] uncredible to be included in the order." The trial court's decree finds that termination is in Lily's best interest; that both parents had endangered Lily through their conduct or had allowed the child to remain with others who engaged in endangering conduct, had placed Lily and knowingly allowed her to remain in conditions that endangered her well-being, and had failed to comply with a court order establishing the actions necessary to regain custody; and that Mother's parental rights to another child had been terminated due to endangerment. *See id.* § 161.001(b)(1)(D), (E), (M), (O), (2). The signed order also states, "The Court finds that [Father's] testimony is not credible."

## STANDARD OF REVIEW

We review the sufficiency of the evidence supporting a trial court's termination decree under well-established standards. The Department must prove by clear and convincing evidence that the parent engaged in conduct that amounts to at least one statutory ground for termination and that termination is in the child's best interest. Tex. Fam. Code § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id*. § 101.007; *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *A.C.*, 560 S.W.3d at 630. In reviewing legal sufficiency, we view the evidence in the light most favorable to the factfinder's determination, including undisputed contrary evidence, and assume the factfinder resolved disputed facts in favor of its finding. *Id.* at 630-31. In reviewing factual sufficiency, we weigh the evidence favoring the finding against disputed evidence and consider whether the evidence "a reasonable factfinder could not have

30

credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*. We must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

## DISCUSSION

Both parents challenge the finding that termination was in Lily's best interest, and Father challenges the court's finding of statutory grounds. We will first consider whether the trial court erred in finding of grounds under Subsections D or E.

### *Statutory Grounds*

Stability and permanence are paramount in the upbringing of children. *In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied). Subsection (D) focuses on the child's environment and whether it "causes the child's physical or emotional well-being to be endangered," with "environment" referring to both the child's living conditions and the environment produced by the conduct of the parents or others in the home. *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.). "Inappropriate, abusive, or unlawful conduct" by those who live in the child's home, including "physical violence or abusive conduct by one parent toward the other parent," is part of the environment under Subsection (D). *Id*. In considering Subsection (E), on the other hand, "the focus is on the parent's conduct—including acts, omissions, or failures to act—and, specifically, on whether the evidence shows that the parent engaged in 'a voluntary, deliberate, and conscious course of conduct' that endangered the child's

31

physical or emotional well-being." *Id.* (quoting Tex. Fam. Code § 161.001(b)(1)(E)). The factfinder may consider the parent's actions and inactions before and after the child was born. *Id.* (citing *In re M.D.M.*, 579 S.W.3d 744, 765 (Tex. App.—Houston [1st Dist.] 2019, no pet.)). "When the evidence pertaining to both subsections (D) and (E) is interrelated, as it is here, we may consolidate our review of the record." *Id.*

A factfinder "is entitled to give 'great weight' to a parent's drug-related conduct, as it is considered a 'significant factor' supporting termination." *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 705 (Tex. App.—Austin 2019, pet. denied); *see In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). Indeed, endangerment can include a parent's "knowledge that a child's mother abused drugs" and failure to protect the child from that conduct. *See In re J.W.S.*, No. 06-14-00018-CV, 2014 WL 3013352, at *6 (Tex. App.—Texarkana July 2, 2014, no pet.) (mem. op.) (quoting *In re U.P.*, 105 S.W.3d 222, 234 (Tex. App.—Houston [14th Dist.] 2003, pet. denied)).

In this case, there was evidence that Father had satisfied many of the Department's requirements and had taken recent steps to establish that he could maintain sobriety and meet Lily's needs. However, his therapist indicated that he had not been fully truthful about his drinking or his living arrangements with Mother, expressing concern about that fact and stating that she could not recommend reunification based on the testimony she had heard. Although Father denied using cocaine, he tested positive twice during the case, and importantly, the trial court stated verbally that it found Father's testimony "uncredible" and included in its order the finding that his "testimony is not credible."

We may not reevaluate the court's decision to refuse to credit Father's testimony and to instead credit the testimony and documentary evidence produced by the Department,

including evidence that Mother tested positive for alcohol during her pregnancy with Lily; that Father allowed Mother to live with him and Lily and allowed her to care for Lily unsupervised; that he tested positive for cocaine twice, including once while he was caring for Lily; that Lily was developmentally delayed when removed from his care; that he continued to test positive for alcohol throughout the case, including after he agreed to abstain; that he did not engage in counseling or undergo an OSAR evaluation for several months after the MSA; that he never installed the Soberlink device as agreed; and that he was not honest with his therapist about the case and his abuse of alcohol. *See A.B.*, 437 S.W.3d at 503; *J.P.B.*, 180 S.W.3d at 573. A "parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *see In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied) (evidence of parent's drug use or that parent allowed child to be around drug user may show "voluntary, deliberate, and conscious course of conduct" that endangers child); *A.C.*, 577 S.W.3d at 699 ("A parent's illegal drug use may constitute endangerment under subsection (E)."). The court could have concluded that by allowing Lily to be alone with Mother after being instructed that Mother had to be supervised, by not acting when Mother drank while pregnant, by drinking and using cocaine while Lily was in his care, and by refusing to engage in the processes that might have helped him regain custody, Father engaged in conduct or allowed Lily to be cared for by someone whose conduct endangered her or placed Lily or allowed her to remain in conditions that endangered her by not acting when Mother was drinking during her pregnancy. Based on this record and the trial court's determination of credibility, we hold that sufficient evidence supported the trial

33

court's finding of grounds under Subsections (D) and (E).[3]  We overrule Father's second issue on appeal.

### *Best Interest*

We review a trial court's best-interest determination in light of the considerations set out in *Holley v. Adams*, taking into account the children's wishes, their emotional and physical needs now and in the future, present and future emotional or physical danger posed to the children, the parenting skills of those seeking custody, any programs available to assist those seeking custody to promote the children's best interest, plans for the children's future, the stability of the home or proposed placement, conduct by the parent that might show that the parent-child relationship is inappropriate, and any excuses for the parent's conduct.  544 S.W.2d 367, 371–72 (Tex. 1976).  The *Holley* factors are not exhaustive and need not all be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).  The children's need for permanence is the paramount consideration when determining a child's present and future physical and emotional needs.  *L.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-18-00125-CV, 2018 WL 3059959, at *1 (Tex. App.—Austin June 21, 2018, no pet.) (mem. op.); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.).  A parent's rights may not be terminated merely because the children might be better off living elsewhere, but the factfinder may consider

---

[3]  Because sufficient evidence supports the court's findings under (D) and (E), we need not consider Father's first issue challenging the (O) finding.  *See Spurck v. Texas Dep't of Fam. & Protective Servs.*, 396 S.W.3d 205, 222 (Tex. App.—Austin 2013, no pet.).

whether termination and adoption versus an impermanent foster-care arrangement would better serve the children's best interest. *See L.R.*, 2018 WL 3059959, at *1.

Mother and Father both had steady employment and housing, had engaged in therapy, and had positive visitations with Lily. However, Mother tested positive for alcohol while pregnant with Lily, who was born premature and taken into Department conservatorship because of Mother's open case involving her older children. There was also evidence that Lily was overweight and developmentally delayed when she was removed from Father's care. In addition, there was evidence that Mother had lived with Father and Lily and had unsupervised contact with the child in violation of orders and a safety plan to the contrary; Mother assaulted Father with a knife after an argument about Lily's removal; and neither parent reported that incident to the Department. The evidence supports a finding that Father abused drugs and alcohol while Lily was in his care and that both parents tested positive for alcohol and cocaine after she was removed, and there was evidence that both parents were not fully honest with their therapists or OSAR evaluators. Father declined to engage in therapy early and, after agreeing to it in the MSA, still delayed his engagement with therapy and the OSAR process until very shortly before the final hearing. Several witnesses testified that both the delay and the apparent lack of honesty raised concerns that Mother and Father could not be safe parents and might place Lily at risk of harm if she was placed in their care. On the other hand, Lily was thriving in her foster home, where she had lived since her removal from Father at about five months old. The family was bonded with the child, was meeting all her needs, had ensured that she received help to reach her developmental milestones, was able to meet her needs in the future, and hoped to adopt her. Based on this record, the trial court could have determined that clear and convincing

35

evidence supported a conclusion that termination of the parents' rights was in Lily's best interest. We overrule Father's third issue and Mother's first issue.

## CONCLUSION

Having upheld the challenged findings of statutory grounds and best interest, we affirm the trial court's final decree terminating Mother's and Father's parental rights to Lily.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Triana and Smith
  Concurring and Dissenting Opinion by Justice Triana

Affirmed

Filed:   October 5, 2022